Joseph G. Pia (9945)
Nathan S. Dorius (8977)
PIA ANDERSON DORIUS REYNARD & MOSS, PLLC
Wells Fargo Building
222 South Main Street, Suite 1800
Salt Lake City, Utah 84101
Tel:  (801) 350-9000
Fax: (801) 350-9010
Email: joe.pia@padrm.com
　　　　nathan@padrm.com

*Attorneys for Plaintiff Incentive Capital, LLC*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| INCENTIVE CAPITAL, LLC, a Utah Limited Liability Company,<br><br>　　　　Plaintiff,<br><br>v.<br><br>CAMELOT ENTERTAINMENT GROUP, INC., a Delaware Corporation; CAMELOT FILM GROUP, INC., a Nevada Corporation; CAMELOT DISTRIBUTION GROUP, INC., a Nevada Corporation, ROBERT P. ATWELL, an individual; JAMIE R. THOMPSON, an individual; STEVEN ISTOCK, an individual; TED BAER, an individual; PETER JAROWEY, an individual,<br><br>　　　　Defendants. | **AMENDED COMPLAINT**<br><br>Civil No.:  2:11-CV-00288<br><br>Judge Paul Warner |

* * * * * * *

Plaintiff Incentive Capital, LLC, a Utah limited liability company, ("Plaintiff" or "Incentive") by its counsel of record Pia Anderson Dorius Reynard & Moss, hereby complains against Camelot Entertainment Group, Inc., a Delaware corporation ("CEG"), Camelot Film Group, Inc., a Nevada corporation ("CFG"), and Camelot Distribution Group, Inc., a Nevada corporation ("CDG" and collectively "Camelot"), Robert P. Atwell ("Atwell"), an individual, Jamie R. Thompson ("Thompson"), an individual, Steven Istock ("Istock"), an individual, Ted Baer ("Baer"), an individual, and Peter Jarowey, an individual ("Jarowey" and collectively "Atwell Defendants") (Camelot and Atwell Defendants may be collectively referred to herein as the "Defendants") (CFG, CEG, CDG, and Atwell may be collectively referred to herein as the "Loan Parties"), and alleges in support thereof as follows:

## NATURE OF THE ACTION

1.     This is a diversity action seeking injunctive and declaratory relief and damages against Camelot and the Atwell Defendants for:  (1) Breach of Contract; (2) Breach of Guaranty; (3) Promissory Estoppel; (4) Quasi Contract, Unjust Enrichment, and/or Quantum Meruit; (5) Breach of Covenant of Good Faith and Fair Dealing; (6) Fraud; (7) Fraud in the Inducement; (8) Alter Ego; (9) Civil Conspiracy; (10) Conversion; (11) Negligent Misrepresentation; (12) Gross Negligence; (13) Constructive Trust; (14) Declaratory Relief; and (15) Tortious Interference with Economic Relations.  These claims arise out of certain loans (collectively the "Loan") that Camelot took from Incentive to finance the acquisition and distribution of a film and television library containing hundreds of media titles ("Liberation Library").

2.      Camelot (including CEG, a public company) and the Atwell Defendants, who are each officers of Camelot, made gross misrepresentations about their financial stability, their ability to pay back loans, their track record marketing and distributing films, and their ability to distribute and exploit the Liberation Library to induce Incentive to provide it with funds to acquire and distribute the Library.

3.      Camelot and the Atwell Defendants which are parties to the loans from Incentive breached the plain terms of the several documents executed in connection with the Loan (the "Loan Documents"), described more fully below, and pursuant to the security agreements Incentive received in connection with the Loan, Incentive foreclosed on the Liberation Library and some additional film titles pledged as collateral on the Loan (collectively, the "Library") and, as a result, is presently the legal title holder of all of the Library's motion picture and television titles and all rights and interests associated therewith or arising therefrom.

4.      Despite the legal acquisition of all ownership rights to the Library by Incentive pursuant to the foreclosure sale, Camelot and the Atwell Defendants are continuing to improperly hold themselves out as the owner of the Library, and are diverting and stealing funds that rightfully belong to Incentive.

5.      Defendants have already damaged Incentive, and unless Defendants are immediately enjoined from furthering their destructive actions, Incentive will suffer irreparable harm.

## DESCRIPTION OF THE PARTIES

6.       Plaintiff Incentive Capital, LLC is a Utah limited liability company with its principal place of business in Utah County, and is therefore a citizen of Utah.

7.     Defendant Camelot Entertainment Group, Inc., is a Delaware corporation with a place of business at 8001 Irvine Center Drive, Suite 400, Irvine, California 92618.  Defendant CEG is a citizen of both Delaware and California.

8.     Defendant Camelot Film Group, Inc., is a Nevada corporation with a place of business at 10 Universal City Plaza, NBC/Universal Building, 20th Floor, Universal City, California 91608.  Defendant CFG is a citizen of both Nevada and California.

9.     Defendant Camelot Distribution Group, Inc., is a Nevada corporation with a place of business at 10 Universal City Plaza, NBC/Universal Building, 20th Floor, Universal City, California 91608. Defendant CDG is a citizen of both Nevada and California.

10.     Defendant Robert P. Atwell is CEO of CEG, CFG, and CDG, and is a resident and citizen of the State of California.

11.     Defendant Jamie R. Thompson is the former President of Distribution of CEG, CFG, and CDG, and is a resident and citizen of the State of California.

12.     Defendant Steven Istock is the CFO of CEG, CFG, and CDG, and is a resident and citizen of the State of California.

13.     Defendant Ted Baer has acted as the General Counsel for CEG, CFG, and CDG, and is a resident and citizen of the State of California.

14.     Defendant Peter Jarowey is a consultant for CEG, CFG, and CDG, and is a resident and citizen of the State of California.

15.     Defendants have conducted business in the State of Utah relative to the loans, security agreements, guarantees, and foreclosure sale of the Library and other related assets, and have participated in many business transactions in Utah relative to the dispute set forth herein.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is among citizens of different states.

17.      This Court has personal jurisdiction over Defendants based on Utah's "long arm" statute, Utah Code Ann. §78B-3-205, inasmuch as Defendants have transacted business in the state of Utah and the claims asserted herein arise out of these transactions.

18.     This Court also has jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202, inasmuch as Plaintiff requests a declaration of its rights *vis a vis* Defendants.

19.     This Court also has jurisdiction over the subject matter of this action pursuant to Sections 15 and 22 of the Securities Act, [15 U.S.C. §§ 77o and 77v].

20.     Venue is appropriate in this Court pursuant to 15 U.S.C. § 77v and 28 U.S.C. §1391(b).  The defendants have purposefully availed themselves of the rights and privileges of the State of Utah, and a substantial part of the events or omissions giving rise to the claims set forth herein occurred in Utah.

21.     As set forth more fully below, on or about April 27, 2010, Incentive entered into a loan agreement with CFG (the "Note"), attached hereto as **Exhibit A**, whereby Incentive agreed to loan CFG the principal amount of $650,000.00 with fees and interest and CFG promised to repay the same according to the express terms of the Note.  *See* Exh. A.

22.     The Note's "Governing Law" section provides in part:  "This Note shall be construed and ***enforced under the laws of the State of Utah*** and any applicable federal laws." *See id.* (emphasis added.)

23.    The Note, and the CEG, Atwell and CDG Guarantees (collectively the "Guarantees" as more fully described and defined below) are secured by collateral, some of which is described in a security agreement between Incentive and CDG (the "CDG Security Agreement"), attached hereto as **Exhibit B**, as "Distribution Assets," a series of thirteen (13) films being distributed by CDG.  *See* Exh. B.

24.    The "Governing Law; Terms" section of the CDG Security Agreement provides:

***This Security Agreement shall be deemed to have been made in the state of Utah and the validity, construction, interpretation, and enforcement hereof, and the rights of the parties hereto, shall be determined under, governed by, and construed in accordance with the internal laws of the state of Utah***.  Debtor hereby consents to the jurisdiction of any Utah state or United States Federal Court sitting in Utah with respect to disputes arising out of this Security Agreement.

*See id* (emphasis added).

25.    The "Waiver of Jury Trial" section of the CDG Security Agreement provides:

***Any legal action or proceeding with respect to this Security Agreement must be brought before the federal or state courts located in the State of Utah***, unless Secured Party elects to bring such legal action or proceeding elsewhere. Debtor hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the federal or state courts located in the State of Utah as having proper venue.  ***Debtor hereby irrevocably waives any objection which it may have now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Security Agreement brought in the aforesaid Utah courts and irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum***, and also consents to the service of process by any means authorized by the State of Utah.

*See id*. (emphasis added).

26.    The parties entered into a security and participation agreement between Incentive and CFG (the "CFG Security Agreement"), attached hereto as **Exhibit C**, for the "Liberation Assets," a large library of approximately 880 motion pictures and television series episodes

(collectively the Liberation Assets and the Distribution Assets [defined herein] shall be referred

to as the "Library").  *See* Library, attached hereto as **Exhibit D**.

27.     The "Governing Law; Terms" section of the CFG Security Agreement is identical

to the CDG Security agreement:

> ***This Security Agreement shall be deemed to have been made in the state of Utah and the validity, construction, interpretation, and enforcement hereof, and the rights of the parties hereto, shall be determined under, governed by, and construed in accordance with the internal laws of the state of Utah***.  Debtor hereby consents to the jurisdiction of any Utah state or United States Federal Court sitting in Utah with respect to disputes arising out of this Security Agreement.

*See id.* (emphasis added).

28.     The "Waiver of Jury Trial" section of the CFG Security Agreement provides:

> ***Any legal action or proceeding with respect to this Security Agreement must be brought before the federal or state courts located in the State of Utah***, unless Secured Party elects to bring such legal action or proceeding elsewhere. Debtor hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the federal or state courts located in the State of Utah as having proper venue.  ***Debtor hereby irrevocably waives any objection which it may have now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Security Agreement brought in the aforesaid Utah courts and irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum***, and also consents to the service of process by any means authorized by the State of Utah.

*See id.* (emphasis added).

29.     On or about April 27, 2010, Incentive entered into a guaranty agreement with

CEG (the "CEG Guaranty"), attached hereto as **Exhibit E**, whereby CEG unconditionally and

absolutely guaranteed payment of all of CFG's indebtedness owing to Incentive, including

without limitation all amounts owing under the Note .  *See* Ex. E.

30.     The CEG Guaranty's "Governing Law" section provides:

The provisions of this Guaranty and the respective rights and duties of Guarantor and Lender hereunder shall be governed by and ***construed in accordance with Utah law and any applicable federal laws***. . . . Guarantor hereby irrevocably agrees that ***all claims in respect of such action or proceeding may be heard and determined in such Utah*** state or federal court.  The Guarantor hereby waives any objection that it may nor or hereafter have to the venue of any suit or any such court or that such suit is brought in any inconvenient court.

*See id.* (emphasis added).

31.     On or about April 27, 2010, Incentive entered into a guaranty agreement with the

CEO of the Camelot Entities, Robert Atwell (the "Atwell Guaranty"), attached hereto as **Exhibit**

**F**, whereby Atwell unconditionally and absolutely guaranteed payment of all of CFG's

indebtedness owing to Incentive, including without limitation all amounts owing under the Note.

*See* Ex. F.

32.     The Atwell Guaranty's "Governing Law" section provides:

The provisions of this Guaranty and the respective rights and duties of Guarantor and Lender hereunder ***shall be governed by and construed in accordance with Utah law and any applicable federal laws***.  Guarantor hereby irrevocably submits to the non-exclusive jurisdiction of any Utah state or federal court sitting in Salt Lake County, over any action or proceeding arising out of or relating to this Guaranty, or any document related to the Obligations, and Guarantor hereby irrevocably agrees that ***all claims in respect of such action or proceeding may be heard and determined in such Utah state or federal court***. The Guarantor hereby waives any objection that it may nor or hereafter have to the venue of any suit or any such court or that such suit is brought in any inconvenient court.

*See id.* (emphasis added).

33.     On or about April 27, 2010, Incentive entered into a guaranty agreement with

CDG (the "CDG Guaranty") as further inducement for the Note, attached hereto as **Exhibit G**,

whereby CDG unconditionally and absolutely guaranteed payment of all of CFG's indebtedness

owing to Incentive, including without limitation all amounts owing under the Note.  *See* Ex. G.

8

34.     The CDG Guaranty's "Governing Law" section provides:

The provisions of this Guaranty and the respective rights and duties of Guarantor and Lender hereunder **shall be governed by and construed in accordance with Utah law and any applicable federal laws**.  Guarantor hereby irrevocably submits to the non-exclusive jurisdiction of any Utah state or federal court sitting in Salt Lake County, over any action or proceeding arising out of or relating to this Guaranty, or any document related to the Obligations, and Guarantor hereby irrevocably agrees that **all claims in respect of such action or proceeding may be heard and determined in such Utah state or federal court**. The Guarantor hereby waives any objection that it may nor or hereafter have to the venue of any suit or any such court or that such suit is brought in any inconvenient court.

*See id.* (emphasis added).

35.     The Guarantees are further secured by collateral described in a separate escrow agreement between Incentive and CEG (the "Escrow Agreement"), attached hereto as **Exhibit H**. *See* Ex. H.

36.     The Escrow Agreement provides in part:  "These Escrow Instructions and this Escrow Agreement shall be **governed by the internal laws of the State of Utah** applicable to contracts negotiated and entered into and performed wholly within the State of Utah."  *See id.* (emphasis added).

37.     On or about June 11, 2010, Incentive entered into a loan modification agreement with Defendants (the "Loan Modification Agreement"), attached hereto as **Exhibit I**, whereby Defendants agreed to meet certain sales and payment benchmarks in addition to their existing obligations under the Note.  In exchange, Incentive agreed to continue its monetary advances to CFG and to refrain from instituting legal action against Defendants for alleged breaches of the Loan Documents.  *See id.* (emphasis added).

38.     The "Recitals" section of the Loan Modification Agreement provides in part: "Unless specifically and expressly modified herein, all remaining terms of the Loan Documents

shall remain in full force and effect." *See id.*  Furthermore, the Loan Modification Agreement does not modify any of the choice of law provisions in the Loan Documents, described more fully below.  *See id.*

39.    Pursuant to the Loan Documents—which comprises the Note, the Guarantees, the Security Agreements, the Escrow Agreement, the Loan Modification, and all related documents—the applicable law as agreed to and acknowledged by Defendants is Utah law, and the proper forum for this action is Utah.

## GENERAL ALLEGATIONS

40.    Plaintiff incorporates by reference each and every one of the allegations contained in the preceding paragraphs of the complaint as if fully set forth herein.

### *The Loan Parties Breached the Terms of the Loan Documents*

41.    As alleged above, on April 27, 2010, CFG executed and delivered the Note to Incentive, evidencing Incentive's Loan to CFG in the principal amount of $650,000.00 with fees and interest and CFG's agreement to repay the same according to the terms of the Note .  *See* Exh. A.

42.    Pursuant to the terms of the Note, the principal amount of $650,000.00, fees of approximately $32,500.00, and applicable interest, and costs were due on or before January 31, 2011. *See id*.

43.    Additional terms of the Loan Documents require the Loan Parties to pay:  (a) interest of one and one-half percent (1.5%) of the outstanding balance of the Note per month commencing May 27, 2010; and (b) ten percent (10%) of all gross revenues received by

Defendants for the exploitation of the Liberation Library described in the CFG Security Agreement. *See id; see* Exh. C.

44.     The Note and all of CFG's indebtedness owing to Incentive is guaranteed by CEG, Atwell, and CDG. *See* Exhs. A, E-G.

45.     The same day that the Note was entered into, on April 27, 2010, Incentive entered into a guaranty agreement with CEG (the "CEG Guaranty") whereby CEG unconditionally and absolutely guaranteed CFG's repayment obligations under the Note. *See* Exh. E.

46.     On or about April 27, 2010, Incentive entered into a second guaranty agreement with Atwell (the "Atwell Guaranty") whereby Atwell unconditionally and absolutely guaranteed CFG's repayment obligations under the Note. *See* Exh. F.

47.     On or about April 27, 2010, Incentive entered into a third guaranty agreement with CDG (the "CDG Guaranty") whereby CDG unconditionally and absolutely guaranteed CFG's repayment obligations under the Note. *See* Exh. G.

48.     The CEG, Atwell and CDG Guarantees (collectively the "Guarantees") are secured by collateral described in a separate security agreement between Incentive and CDG (the "CDG Security Agreement") including the "Distribution Assets," a list of thirteen (13) films in which CDG has certain distribution and license rights. *See* Exh. B.

49.     The Guarantees are secured by additional collateral described in a separate security and participation agreement between Incentive and CFG (the "CFG Security Agreement") including the "Liberation Assets," which encompasses a large library of motion pictures and television series. *See* Exh. C.

50.     Pursuant to the CFG Security Agreement, CFG agreed to provide detailed quarterly statements including, without limitation, an accounting of all revenue and expenses related to the disposition or other exploitation of the Liberation Library.  *See id.*  CFG further agreed to provide a monthly general statement indicating the total gross revenues received for or in connection with the disposition or other exploitation of the Liberation Library from the previous month.  *See id.*

51.     The Guarantees are further secured by collateral described in a separate escrow agreement between Incentive and CEG (the "Escrow Agreement") referred to as "Pledged Shares."  *See* Exh. H.  By way of the Escrow Agreement, Defendants offered CEG Class F Convertible Preferred shares as additional collateral securing CFG's Note obligations and its indebtedness owing to Incentive.

52.     Shortly after Incentive made the Loan to CFG, the Loan Parties breached certain terms of the Loan Documents, including certain representations and warranties made in the Loan Documents and in connection therewith relating to certain benchmarks for exploitation of the Liberation Library.

53.     On or about June 11, 2010, in an effort to remedy the Loan Parties' breach of the Loan Documents and maintain a working relationship with Defendants, Incentive entered into a loan modification agreement with the Loan Parties (the "Loan Modification"), whereby the Loan Parties agreed to meet certain sales and payment benchmarks in addition to their obligations under the Note.  *See* Exh. I.

54.     Pursuant to the Loan Modification, the Loan Parties agreed to generate sales from the exploitation of the Liberation Library in an amount not less than $2,284,500.  *See id.*  The

Loan Parties further agreed to pay Incentive "Increased Participation Amounts" of 13% of all revenues received less than $200,000, and 15% of all revenues received greater than $200,000. *See id.* The Loan Parties agreed to pay the Increased Participation Amounts to Incentive until such time that Incentive received at least $375,000 in Increased Participation Amounts, at which time the payments Incentive would receive from the Loan Parties would be equal to 10% of all revenues. *See id.*

55.     Based on the Loan Parties' representations, Incentive agreed to continue its monetary advances to CFG and to refrain from instituting legal action against Defendants or pursuing any of the collateral. *See id*.

56.     Despite Incentive's good-faith attempt to work through the Loan Parties' initial breach of the Loan Documents by entering into the Loan Modification Agreement, the Loan Parties failed to meet their obligations under the Loan Modification Agreement and the terms of the Note.

57.     To date, the Loan Parties have failed to meet their obligations to Incentive under the Loan Documents and the Loan Modification Agreement.

### *Incentive Properly Foreclosed on the Library and Related Rights and Interests*

58.     Incentive has notified Defendants of the breach of the Loan Documents on numerous occasions.

59.     After many unsuccessful attempts to settle the matter, Incentive initiated non-judicial foreclosure of its security interest in portions of the pledged collateral set forth in the Security Agreements.

60.     On February 9, 2011, Incentive issued a proper Notice of Disposition of Collateral by Public Sale that set as the sale date February 21, 2011.

61.     Incentive duly published notice of the public sale in a commercially reasonable manner.

62.     On February 21, 2011 at 9:00 a.m., Incentive held a properly noticed foreclosure sale (the "Foreclosure Sale") in the state of Utah to foreclose on collateral set forth in the Security Agreements.

63.     All aspects of the Foreclosure Sale were commercially reasonable, including the method, manner, time and place thereof.

64.     Also on February 21, 2011, Incentive issued a Transfer Statement to Defendants stating, among other things:

> The debtors, Camelot Distribution Group, Inc., Camelot Entertainment Group, Inc., and Camelot Film Group, Inc. (collectively, "Debtor"), defaulted under their loan obligations to the secured party, Incentive Capital, LLC (the "Secured Party"). As a result thereof, the Secured Party, pursuant to its Notice of Disposition of Collateral by Public Sale dated February 9, 2011, did conduct a public sale of the following personal property constituting a portion of Secured Party's collateral (the "Collateral"):
>
>> All of Debtor's rights to the film library described herein below and referred to as the "Distribution Assets", along with all products and proceeds of or from (a) the Distribution Assets; and (b) all accounts, negotiable instruments, chattel paper and electronic chattel paper, general intangibles, proceeds, and monies derived from the disposition or other exploitation of the Distribution Assets in all media, from all sources, worldwide during the term hereof. The Distribution Assets include without limitation the following films, and all of Debtor's right, title and interest therein, including distribution rights, royalty interests, and contract/account payments: Samurai Avenger; First Strike; Screwball: The Ted Whitfield Story (aka The Wiffler); The Fallen; One Lucky Dog (aka Weiner Dog Nationals); Never Sleep Again; Hellraiser Unleashed; Fink!; Nude Nuns With Big Guns; Zombie Culture; National Lampoons Dirty Movie; Who Is KK Downey; and Next of Kin.

> All of Debtor's personal property assets and interests as more particularly described in the Asset Purchase Agreement (the "Asset Purchase Agreement") dated April 28, 2010 between Camelot Film Group, Inc., a Nevada corporation, on the one hand, and CMBG Advisors, Inc., a California corporation in its sole and limited capacity as assignee for the benefit of creditors of Liberation Group, Inc., on the other hand, and all products and proceeds thereof, including without limitation (a) that certain film library referred to as the Liberation Assets (as defined in the Asset Purchase Agreement); (b) all accounts, negotiable instruments, chattel paper and electronic chattel paper, general intangibles, proceeds, and monies derived from the disposition or other exploitation of the Liberation Assets in all media, from all sources, worldwide during the term hereof; and (c) other assets of the Debtor as set forth in the Asset Purchase Agreement.

*See* Transfer Statement, attached hereto as **Exhibit J**.

65. Defendants permitted the Foreclosure Sale to be conducted. In fact, legal counsel for the Defendants was present at the Foreclosure Sale.

66. Incentive was the successful bidder at the Foreclosure Sale. Immediately following the Foreclosure Sale, Incentive became the legal title holder to the Library, and each and every title therein, all tangible and intangible elements thereto, and all rights to proceeds and other value derived therefrom.

67. The Foreclosure Sale, as evidenced by the Transfer Statement, transferred ownership of all of the collateral set forth in the Security Agreements to Incentive.

68. Defendants refuse to acknowledge the ownership interests of Incentive and are improperly maintaining control over funds, physical property, and intellectual property, including without limitation contracts and payment rights in contravention of Incentive's ownership rights.

69. On March 7, 2011, CDG wrongfully brought a copyright infringement suit in California federal court against nearly 5,865 Doe Defendants who have allegedly downloaded

one or more of the Library films without authorization. *See Camelot Distribution Group, Inc. v. Does 1 through 5865,* Case No. CV11-01949 ("Improper Infringement Suit"). Camelot alleges in the Improper Infringement Suit that it is "licensed with the exclusive right to distribute the Motion Picture in the United States for any and all media platforms, including but not limited to theatrical, home video, television and Internet." *See id.*

70.     Contrary to such representations at the time the Improper Infringement Suit was brought, all distribution and ownership rights of the alleged "Motion Picture' and all motion pictures and media included in the Library belonged solely to Incentive. CDG does not have standing to maintain the Improper Infringement Suit, because Incentive – not CDG – is the owner of any and all rights CDG once had in the Library.

71.     CDG is therefore incorrectly and fraudulently holding itself out as the legal title holder to rights in the Library.

72.     Defendants are diverting and converting revenue that is being generated from the Library that rightfully belongs to Incentive.

73.     Defendants are refusing to provide information regarding the location of physical elements of the Library, such as where master video and audio recordings are stored, licensing contracts and terms, and where revenue and funds are being deposited that are derived from the Liberation Library.

74.     These actions violate the property rights of Incentive, are a breach of the parties' agreements, and amount to, among other things, conversion, theft, and trespass.

*Camelot and the Atwell Defendants*
*Made Fraudulent Misrepresentations to Induce the Loan*

75.     In order to induce Incentive to make the Loan and enter into the Loan Documents,

Camelot and the Atwell Defendants made misrepresentations regarding their financial stability,

their ability to repay the loan, their ability to distribute and generate revenues from exploitation

of the Liberation Library, and the value of the Liberation Library.

76.     On March 24, 2010, Jarowey, Camelot's advisor and representative performing

the due diligence in relation to the loan agreements, provided Incentive with an income statement

with actual and monthly forecasts from 2009 for the Liberation Library as support for Camelot's

representation that the Liberation Assets would generate sufficient cash flow to pay back the loan

and meet the represented revenue benchmarks.

77.     On March 30, 2010, Jarowey further indicated that the monthly average gain for

the Liberation Assets in 2009 was between $200,000 and $300,000 in support for his

representation that the Liberation Library would garner at least the same results in 2010 and

beyond.

78.     The foregoing representations about the profitability of the Liberation Assets were

material and were relied upon by Incentive in providing financing.

79.     The foregoing representations were false.

80.     On April 1, 2010, Baer, acting general counsel for Camelot during the negotiation

of the loan agreements, misrepresented that CDG's assets have a significantly higher value than

the amount of the proposed loan and the interest thereon.

81.     On April 16, 2010, Thompson, former President of Distribution, in an attempt to

induce Incentive to loan the funds at issue to CFG, misrepresented Defendants' ability to market

17

and commercialize the Liberation Assets and the Distribution Assets at the upcoming annual

Cannes film festival, and, therefore, misrepresented its ability to generate sufficient revenues to

repay the Loan.

82. Thompson further represented that the animation titles and classic TV titles of the

Liberation Library have tremendous worth, would exceed $300,000 per month in revenue, have

generated high interest among distributors and media buyers, that Camelot had already been

approached by bulk package buyers, and that Camelot knows who to target to generate

Defendants' projected revenues.

83. On April 22, 2010, Thompson provided Incentive with a cash flow forecast for

the Liberation Library in further support for representations that the Liberation Library would

generate sufficient revenue to meet Camelot's projected sales targets.

84. Thompson's representations in the preceding paragraphs were false.

85. Pursuant to the Loan Documents which were executed on April 27, 2010, Atwell

represented that the Liberation Assets were generating no less than $150,000 monthly in

"Existing Sales Revenue." This representation was false.

86. Camelot and Atwell further represented that Defendants' exploitation of the

Liberation Library would generate $22,845,000 in "Exploitation Sales Revenue." This

representation was false.

87. Additionally, Camelot and Atwell were given a 25% cushion within which the

Exploitation Sales Revenue would be acceptable pursuant to the Loan Documents, allowing

Defendants to meet their represented projection with $17,133,750 in Exploitation Sales Revenue,

reflecting a 25% decrease.

88.     That Camelot would meet the Exploitation Sales Revenue benchmark or the lower cushioned benchmark were egregious misrepresentations.

89.     Camelot and Atwell further represented that Incentive would receive 10% of the Existing Sales Revenue, or at least $15,000 monthly, and 10% of the Exploitation Revenues, or at least $190,375 monthly, for a total of $205,375 each month ("Payment Benchmark").

90.     Alternatively, Camelot and Atwell represented that Incentive would receive 10% of the Existing Sales Revenue, or at least $15,000 monthly, and 10% of the Exploitation Revenues as modified by the 25% cushion referenced in the preceding paragraph, or at least $142,781.25 monthly, for a total of $157,781.25 ("Cushioned Benchmark").

91.     Based on the foregoing misrepresentations, as well as the aforementioned Security Agreements and Guarantees, including Atwell's personal guaranty, Incentive lent CFG the funds to acquire and distribute the Liberation Library.

92.     It was only a matter of months before Camelot was seriously underperforming on its agreed-to benchmarks for distributing the Liberation Library, resulting in immediate breach of the Loan Documents.

93.     Camelot has not generated monthly revenues in accordance with its or the other Atwell Defendants' representations.

94.     To date, Incentive has not received any payments remotely close to the $205,375 monthly payments represented.  Nor have the Defendants met their cushioned Benchmark Payments as modified by the 25% cushion referenced above of $157,781.25.

95.     The Loan Parties materially breached the terms of the Loan Documents.

96.     Further, the Loan Parties failed to meet their modified payment and performance obligations under the Loan Modification.

97.     The Defendants knowingly and/or recklessly made material misrepresentations regarding their income statements, their financial stability, their ability to undertake and pay back loans, and their distribution capabilities in order to induce Incentive to enter into the Loan Documents, while knowing that they would not be able to achieve their said projections.

98.     But for Defendants' misrepresentations, Incentive would not have entered into the agreements set forth in the Loan Documents.

## FIRST CAUSE OF ACTION
### (Breach of Contract – Against CFG)

99.     Incentive hereby incorporates by reference the allegations set forth above as if fully set forth herein.

100.    The Loan Documents, whereby CFG agreed to repay the Loan pursuant to the Note, and whereby CEG, Atwell and CDG guaranteed CFG's repayment pursuant to the Guarantees, the Security Agreements, and the Escrow Agreement, constitute valid and enforceable express or implied contracts in that Incentive agreed to loan $650,000.00 in principal to CFG in exchange for CFG's promise to make repayment in full for the Loan plus interest, fees and costs, and for CEG's, Atwell's and CDG's unconditional and absolute guarantee of CFG's repayment in full for the Loan to Incentive.

101.    Incentive rendered performance of its obligations under the Loan Documents, by making the loan to CFG, which was authorized, requested, approved and accepted by Defendants to their benefit.

102.     The Loan Parties, on the other hand, materially breached the Loan Documents, by, among other things, failing to repay Incentive the $650,000.00 in principal plus interest, fees and costs to Incentive as required under the Loan Documents, and in particular the Note and Guarantees.

103.     The Loan Parties have breached their performance obligations as set forth in the Loan Documents, such as to generate income in accordance with their projections and to provide detailed accounting of revenues received on a monthly and quarterly basis.

104.     The Loan Parties have failed to make interest payments, and revenue payments as required under the terms of the Note, and have improperly diverted and converted funds belonging to Incentive to themselves in violation of the parties' agreements.

105.     As a direct and proximate result of the Loan Parties' breach of the Loan Documents, as described above, Incentive has incurred, and continues to incur, damages in an amount to be determined at trial, but no less than $650,000.00 plus all costs, expenses and attorneys' fees incurred by Incentive.

106.     Incentive is, therefore, entitled to judgment as set forth below in the Prayer for Relief.

## SECOND CAUSE OF ACTION
### (Breach of Guarantees – Against CDG, CEG and Atwell)

107.     Incentive hereby incorporates by reference the allegations set forth above as if fully set forth herein.

108.     The Guarantees, whereby CDG, CEG and Atwell unconditionally and absolutely guaranteed repayment in full for Incentive's loan to CFG, constitute valid and enforceable express or implied contracts.

109.    Incentive rendered full performance of its obligations under the Loan Documents, by making the Loan to CFG, which was authorized, requested, approved and accepted by Defendants to their benefit.

110.    CDG, CEG and Atwell, on the other hand, materially breached the Guarantees by, among other things, failing to satisfy CFG's repayment and performance obligations to Incentive under the Note when CFG failed to make its balloon payment of $650,000.00 in principal, its profit participation payments, along with interest, fees and costs to Incentive.

111.    As a direct and proximate result of CDG's, CEG's and Atwell's breach of the Guarantees, Incentive has incurred, and continues to incur, damages in an amount to be determined at trial.

112.    Incentive is, therefore, entitled to judgment as set forth below in the Prayer for Relief.

### THIRD CAUSE OF ACTION
**(Promissory Estoppel – Against the Loan Parties)**

113.    Incentive hereby incorporates by reference the allegations set forth above as if fully set forth herein.

114.    Incentive relied to its detriment on the Loan Parties' representations and agreements to comply with their obligations under the Loan Documents.

115.    Had Incentive known that the Loan Parties would not repay the Loan and make the monthly payments in accordance with the aforementioned representation and benchmarks, Incentive would not have provided financing to CFG.

116.   Under these circumstances, it would be fundamentally unfair to permit the Loan Parties to deny the existence of a contract and their payment obligations, and they should be estopped from doing so.

117.   Incentive has fully performed all of its obligations under the Loan Documents.

118.   Incentive has demanded repayment from the Loan Parties of any remaining balance owed under the Loan Documents and other payment obligations, but the Loan Parties have failed to comply with such demands and the plain terms of their agreements.

119.   Under the Loan Documents, the Loan Parties are obligated to pay Incentive the principal amount of $650,000.00, all unpaid profit participation payments, accrued but unpaid interest and fees, plus all costs, expenses and attorneys' fees incurred by Incentive in an amount to be determined at trial.

120.   Incentive is therefore entitled to judgment against the Loan Parties as set forth below in the Prayer for Relief.

**FOURTH CAUSE OF ACTION**
**(Quasi Contract, Unjust Enrichment and/or Quantum Meruit Claim –**
**Against the Loan Parties)**

121.   Incentive hereby incorporates by reference the allegations set forth above as if fully set forth herein.

122.   If for any reason the trier-of-fact in this case fails to identify the existence of enforceable and binding contracts between Incentive and the Loan Parties, including the Loan Documents, Incentive asserts an alternative claim for Quasi Contract, Unjust Enrichment and/or Quantum Meruit against the Loan Parties.

123.     Incentive provided a Loan in the principal amount of $650,000.00 to CFG for the Loan Parties' benefit, thereby conferring a benefit upon the Loan Parties with a reasonable expectation of being compensated in an amount equal to the value of the Loan, plus profit participation payments, interest, and fees.

124.     Among other things, Incentive, in justifiable and reasonable reliance on the Loan Parties' promise to pay, provided a Loan in the principal amount of $650,000.00 to CFG.

125.     To permit the Loan Parties to retain the benefits received for the Loan on their behalf without complying with their payment and profit participation obligations, would result in an unconscionable and unjust enrichment of the Loan Parties at Incentive's expense.

126.     The Loan Parties were fully aware of the benefits conferred upon them by Incentive.

127.     Incentive did not act as a volunteer or intermeddler in making the Loan because the Loan was expressly requested, authorized and accepted by Defendants.

128.     The Loan Parties have been unjustly enriched, and Incentive is entitled to recover under a theory of quasi contract/quantum meruit, in an amount to be determined at trial but in no event less than $650,000.00, profit participation payments, accrued but unpaid interest and fees, plus all costs, expenses and attorneys' fees incurred by Incentive.

129.     Incentive is therefore entitled to judgment against the Loan Parties as set forth below in the Prayer for Relief.

## FIFTH CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing –
### Against the Loan Parties)

130.    Incentive hereby incorporates by reference the allegations set forth above as if fully set forth herein.

131.    The Loan Documents constitute binding agreements between Incentive and the Loan Parties.

132.    An implied covenant of good faith and fair dealing inheres in the Loan Documents that requires the Loan Parties to not act in any manner that denies Incentive the benefit of its bargain under the Loan Documents as set forth above.

133.    The Loan Parties breached the implied covenant of good faith and fair dealing by, among other things, misrepresenting the financial stability, marketing and distribution capabilities of Defendants, the assets owned or controlled by Defendants, and the ability to meet their obligations under the Loan Documents.

134.    The Loan Parties' breach of the covenant of good faith and fair dealing has directly and proximately caused damages to Incentive in an amount to be determined at trial, together with the value of interest, costs, and attorneys' fees.

135.    Incentive is therefore entitled to judgment against the Loan Parties as set forth below in the Prayer for Relief.

## SIXTH CAUSE OF ACTION
### (Fraud – Against All Defendants)

136.    Incentive hereby incorporates by reference the allegations set forth above as if fully set forth herein.

137.    Defendants made representations regarding their ability to generate certain revenues in connection with the exploitation of the Liberation Library, and to meet certain benchmarks and performance obligations pursuant to the Loan Documents as set forth above.

138.    Defendants knew, at the time such representations were made, that they were unable to generate the revenues as represented or meet the benchmarks and performance obligations as agreed upon by the parties, including the repayment of the Loan.

139.    Defendants made the aforesaid misrepresentations in order to induce Incentive to enter into the Loan Documents and make the Loan to CFG.

140.    Incentive was ignorant as to the falsity of Defendants' misrepresentations and relied on the same misrepresentations as truth.

141.    Incentive reasonably and justifiably relied on Defendants' misrepresentations, which were central to Incentive's decision to enter into the Loan Documents and make the Loan. As such, Defendants' misrepresentations were material.

142.    As a direct and proximate result of Defendants' fraudulent actions, Incentive has suffered significant damages.

143.    Incentive is therefore entitled to judgment against Defendants as set forth below in the Prayer for Relief.

## SEVENTH CAUSE OF ACTION
### (Fraud in the Inducement – Against All Defendants)

144.    Incentive hereby incorporates by reference the allegations set forth above as if fully set forth herein.

145.    Incentive entered into the Loan Documents based on the misrepresentations and omissions made by Defendants that they were financially stable, able to undertake and fully

perform under the Loan Documents, and capable of exploiting the Liberation Library as set forth above.

146.    Defendants made the aforesaid misrepresentations and omissions knowing them to be false, with the intent to defraud, deceive and induce Incentive to make the Loan, and with no intention of performing under the Loan Documents.

147.    Incentive was ignorant of Defendants' intentions not to perform, and in the exercise of reasonable diligence could not have discovered Defendants' intentions or the falsity of their representations.

148.    In justifiable reliance on Defendants' misrepresentations, Incentive was induced to and did enter into the Loan Documents as set forth above.

149.    Had Incentive known of Defendants' actual intentions or of the facts surrounding the same, Incentive would not have made the Loan.

150.    Defendants' conduct was malicious, fraudulent, oppressive and/or recklessly committed, with wanton disregard of Incentive's rights and interests.

151.    Incentive has been damaged by Defendants' actions.

152.    Incentive is therefore entitled to judgment against Defendants as set forth below in the Prayer for Relief.

**EIGHTH CAUSE OF ACTION**
**(Alter Ego – Against All Defendants)**

153.    Incentive hereby incorporates by reference the allegations set forth above as if fully set forth herein.

154.    Upon information and belief, the Defendants have had such a unity of interest, ownership, and control that the separate personalities of the parties do not exist, but are instead the alter ego of each other.

155.    Upon information and belief, the Atwell Defendants used one or more the Camelot entities, including CDG, CFG and CEG, and personal accounts for the purpose of improperly hiding assets, and diverting production funds either owed to, belonging to, or attributable to Incentive.

156.    Upon information and belief, the Atwell Defendants have failed to observe corporate formalities.

157.    Upon information and belief, the Atwell Defendants improperly commingled funds, thus allowing them to withhold consideration from Incentive and to misappropriate and hide monies.

158.    Upon information and belief, the Atwell Defendants failed to keep separate capital accounts and/or commingled funds.

159.    The Atwell Defendants have been conducting, managing, and controlling the affairs of Camelot as though such affairs were their own.

160.    Upon information and belief, Camelot has not ever had any genuine or separate existence from the Atwell Defendants, but these parties have used Camelot for the sole purpose of transacting business under a separate guise.

161.    Observation of the corporate form of Camelot as separate from the Atwell Defendants would sanction a fraud, promote injustice, or result in an inequity.

162.     Because Camelot and the Atwell Defendants are the alter egos of one another, each is jointly and severally liable for the obligations of one another, and judgment must be entered against them jointly and severally, in an amount to be determined at trial.

163.     Incentive is therefore entitled to judgment against Defendants as set forth below in the Prayer for Relief.

### NINTH CAUSE OF ACTION
### (Civil Conspiracy – Against All Defendants)

164.     Incentive hereby incorporates by reference the allegations set forth above as if fully set forth herein.

165.     Defendants conspired to deprive Incentive of monies and other property by among other things, making the misrepresentations set forth herein, failing to repay the amounts due under the Loan Documents, diverting and converting funds and property that rightfully belong to Incentive, and falsifying information and other documents reasonably relied upon by Incentive.

166.     Defendants have no legal or lawful claim to the Library or funds and interests derived therefrom.

167.     As owner of the Library, Incentive should be entitled to freely exploit the assets therein to generate revenue and to enlist the assistance of other individuals and parties to commercialize the Library.

168.     Defendants have and continue to undertake an unlawful conspiracy to deprive Incentive of monies and property rightfully belonging to Incentive.

169.     Defendants have and continue to improperly misappropriate assets of Incentive, including revenue rightfully belonging to Incentive.

170.     Defendants' conspiracy has directly and proximately caused damages to Incentive in an amount to be determined at trial, together with the value of interest, costs, and attorneys' fees.

171.     Incentive is therefore entitled to judgment against Defendants as set forth below in the Prayer for Relief.

## TENTH CAUSE OF ACTION
### (Conversion – Against the Loan Parties)

172.     Incentive hereby incorporates by reference the allegations set forth above as if fully set forth herein.

173.     Pursuant to the Loan Parties' breach of the Loan Documents and the subsequent Foreclosure Sale of the Library, Incentive is the rightful owner of the Library, including all revenues generated therefrom ("Incentive's Property").

174.     The Loan Parties have intentionally interfered with Incentive's Property by unlawfully retaining funds and profits that belong to Incentive as well as all of the underlying physical elements of the Library, including DVDs, audio/visual recordings, masters and the like.

175.     The Loan Parties have intentionally interfered with Incentive's Property by holding themselves out as the owners.

176.     The Loan Parties' interference with and theft of Incentive's Property have deprived Incentive of the ability to enjoy the benefits thereof.

177.     The Loan Parties' conversion has directly and proximately caused damages to Incentive.

178.     Incentive is therefore entitled to judgment against the Loan Parties as set forth below in the Prayer for Relief.

## ELEVENTH CAUSE OF ACTION
### (Negligent Misrepresentation – Against All Defendants)

179.   Incentive hereby incorporates by reference the allegations set forth above as if fully set forth herein.

180.   Under the parties' agreements, Defendants were required to provide Incentive with accurate information as set forth in the First Cause of Action, including, without limitation, information concerning revenues being generated from existing and exploitation sales of the Liberation Library, Camelot's financial ability to take and repay loans, and Camelot's performance of all other obligations under the Loan Documents.

181.   Defendants' deviation from the agreements and election to not provide information to Incentive constitutes the non-disclosure of material information.

182.   Defendants knew that they were misinforming or omitting material information from Incentive.

183.   Defendants knew, should have known, or expected that Incentive would rely on Defendants' misrepresentations or omissions.

184.   Incentive relied upon Defendants' misrepresentations or omissions and undertook to perform according to the agreements until discovering Defendants' wrongdoing.

185.   Incentive is therefore entitled to judgment against Defendants as set forth below in the Prayer for Relief.

## TWELFTH CAUSE OF ACTION
### (Gross Negligence – Against All Defendants)

186.   Incentive hereby incorporates by reference the allegations set forth above as if fully set forth herein.

187.     As a public company, and employees of said company, holding itself out as a responsible borrower of funds in relation to media and entertainment investment transactions, CEG and the principals thereof owe a duty of care to lenders, including Incentive, from whom they borrow investment funds.

188.     Defendants not only breached their duty of care to Incentive, but failed to observe even slight care by carelessly or recklessly misrepresenting their financial stability, their ability to repay monies loaned to them by Incentive, and their ability to distribute and generate revenues from the exploitation of the Liberation Library.

189.     Given Defendants' previous experience and sophistication in borrowing funds for media and entertainment investment transactions, Defendants' careless and reckless actions as set forth above shows utter indifference to the consequences that Defendants should have known would result.

190.     As a direct and proximate result of Defendants' failure to observe even slight care, which arises to the level of gross negligence, Incentive reasonably, justifiably and detrimentally relied on Defendants' misrepresentations and has suffered significant damages.

191.     Incentive is therefore entitled to judgment against Defendants as set forth below in the Prayer for Relief.

### THIRTEENTH CAUSE OF ACTION
#### (Constructive Trust – Against the Loan Parties)

192.     Incentive hereby incorporates by reference the allegations set forth above as if fully set forth herein.

193.     When the Loan Parties improperly retained monies and property (including all tangible and intangible elements of the Library) and failed to provide the same to Incentive as

required under the Loan Documents, and pursuant to the Foreclosure Sale, they wrongfully took and retained property in contravention of Incentive's rights.

194.    The Loan Parties' wrongful acts were intentional, active, egregious and willful.

195.    The Loan Parties have improperly retained the benefits of their wrongful acts.

196.    The Loan Parties have been unjustly enriched by their wrongful acts.

197.    The specific monies and property wrongfully retained by the Loan Parties are traceable to the Loan Parties' bank accounts, warehouses, offices, and other facilities maintained by the Loan Parties.

198.    Injustice would result if the Loan Parties were able to keep property that rightfully belongs to Incentive.

199.    Incentive is therefore entitled to judgment against Defendants as set forth below in the Prayer for Relief.

**FOURTEENTH CAUSE OF ACTION**
**(Declaratory Relief – Against All Defendants)**

200.    Incentive hereby incorporates by reference the allegations set forth above as if fully set forth herein.

201.     Incentive and the Loan Parties entered into Loan Documents wherein each party agreed to perform certain obligations set forth above and in the attached agreements, incorporated herein by this reference.

202.    According to the Loan Documents, upon breach by the Loan Parties, Incentive is entitled as a secured creditor to foreclose on any portion or all of the collateral set forth in the Security Agreements, including without limitation the Library.

203.    Incentive conducted a proper Foreclosure Sale on the Library after providing appropriate notice and publication of the sale.

204.    Immediately following the sale on February 21, 2011, Incentive became the legal title owner of the Library.

205.    Defendants refuse to acknowledge the ownership interests of Incentive and are improperly retaining funds and tangible and intangible property in contravention of Incentive's ownership rights.

206.    Defendants are diverting and converting revenue and property that rightfully belong to Incentive.

207.    Defendants are refusing to provide information regarding the location of physical elements of the Library, such as where licensing contracts, master video and audio recordings are stored, and where revenue and funds are being deposited.

208.    These actions violate the property rights of Incentive.

209.    An actual, justiciable controversy exists between Incentive and Defendants as to the parties' rights and privileges, particularly with regard to the Library.

210.    Incentive's interests are adverse to Defendants' interests.

211.    Incentive and Defendants have legally protectable rights and interests in the aforementioned controversy, particularly as they relate to ownership of the Library.

212.    The causes of action raised by Incentive in this Complaint evidence that the issue of the parties' rights and privileges under the Loan Documents and relating to the Library are ripe for judicial determination.

213.    Based on the allegations set forth herein, Incentive requests the Court to declare that:

a.    Incentive is the legal owner of all right, title, and interest in and to the Library and all other rights and interests related thereto or arising therefrom.

b.    Per the parties' agreements, Defendants must provide all funds, contracts, contract rights, property (whether physical or intangible), accounts, all products and proceeds of or from the Library; and all accounts, negotiable instruments, chattel paper and electronic chattel paper, general intangibles, proceeds, and monies derived from the disposition or other exploitation of the Library in all media, from all sources, worldwide.

c.    None of the Defendants retains any rights relative to the Library.

d.    Defendants must affirmatively indicate to all interested third parties that Incentive is the owner thereof.

e.    Incentive has acted properly in all respects relative to the Library and other matters at issue herein.

214.    Incentive is therefore entitled to judgment against Defendants as set forth below in the Prayer for Relief.

**FIFTEENTH CAUSE OF ACTION**
(Tortious Interference with Economic Relations – Against All Defendants)

215.    Incentive hereby incorporates by reference the allegations set forth above as if fully set forth herein.

216.    As a result of the Foreclosure Sale, Incentive became the legal title owner of the Library and all rights and interests related thereto or arising therefrom.

217.     Among said rights and interest are the (i) distribution or licensing agreements for portions of the Library and (ii) right to initiate and prosecute the Improper Infringement Suit.

218.     Defendants continue to interfere with the economic relations of Incentive by, among other things, (i) directing third party payments under said distribution and licensing agreements to themselves rather than to Incentive and (ii) prosecuting the Improper Infringement Suit belonging to Incentive.

219.     Such interference is tortious inasmuch as Defendants have done so knowingly following the divestiture of all of their rights and interests to the Library following the Foreclosure Sale, and following demands by Incentive to cease such interference.

220.     Incentive is therefore entitled to judgment against Defendants as set forth below in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Incentive demands judgment against Defendants as follows:

1.     For a judgment against Defendants for each of the causes of action set forth above, including punitive damages where applicable, attorneys' fees, costs, and other relief as the Court may deem just, but in no event less than $75,000;

2.     For a judgment for at least the principal of the Note for $650,000, plus interest, costs, pre and post-judgment interest, attorneys' fees, and other consequential damages.

3.     Disgorgement of monies and property wrongfully retained by Defendants;

4.     Specific performance as to all obligations set forth in the parties' agreements, including the full and complete delivery to Incentive of all contracts, information whether in physical or electronic form, files, physical masters of the Liberation Library and elements thereto

such as all audio/visual materials, spreadsheets, accounting documents, accounts, all products and proceeds of or from the Library, negotiable instruments, chattel paper and electronic chattel paper, general intangibles, proceeds, and monies derived from the disposition or other exploitation of the Library in all media, from all sources, worldwide.

5.      The imposition of a constructive trust for the benefit of Plaintiff on monies, property, and other value improperly retained by Defendants;

6.      For a third-party collection account to receive and distribute all revenue generated from the exploitation of the Distribution Assets and the Liberation Library;

7.      For a restraining order and preliminary injunction preventing Defendants from (i) further interference with the Library and business associated with the Library, and improper infringement suit, and (iii) any activities interfering with, hindering, or delaying Incentive's exercise of its rights and interest in and to the Library, exploitation of the Library, including all payments received under any distribution or licensing agreements;

8.      Declaratory relief adjudicating that:

a.      Incentive is the legal owner of all right, title, and interest in and to the Library and all other rights and interests related thereto or arising therefrom.

b.      Per the parties' agreements, Defendants must provide all funds, contracts, contract rights, property (whether physical or intangible), accounts, all products and proceeds of or from the Library; and all accounts, negotiable instruments, chattel paper and electronic chattel paper, general intangibles, proceeds, and monies derived from the disposition or other exploitation of the Library in all media, from all sources, worldwide.

c.      None of the Defendants retains any rights relative to the Library.

      d.      Defendants must affirmatively indicate to all interested third parties that Incentive is the owner thereof.

      e.      Incentive has acted properly in all respects relative to the Library and other matters at issue herein.

9.      Determination that Defendants have operated as alter egos of one another and, therefore that the corporate veil of each of CEG, CDG, and CFG should be disregarded and pierced with all corporate liabilities and obligations being assessed to and borne by the Defendants jointly and severally.

10.      Judgment in favor of Plaintiff against Defendants jointly and severally on all claims;

11.      For such other and further legal or equitable relief as the Court deems just and proper.

DATED this 14th of April, 2011.

PIA ANDERSON DORIUS REYNARD & MOSS

 /s/ Joseph G. Pia                          
Joseph G. Pia
Nathan Dorius
*Attorneys for Plaintiff*

Plaintiff's Address:

Incentive Capital, LLC
222 South Main Street, Suite 1800
Salt Lake City, Utah 84101

**EXHIBIT LIST**

Exhibit A-    April 27, 2010 Incentive loan agreement with CFG

Exhibit B-    Security Agreement between Incentive and CDG

Exhibit C-    Security and Participation agreement between Incentive and CFG

Exhibit D-    Liberation Library

Exhibit E-    April 27, 2010 Incentive guaranty agreement with CEG

Exhibit F-    April 27, 2010 Incentive guaranty agreement with Robert Atwell

Exhibit G-    April 27, 2010 CDG guaranty agreement with Incentive

Exhibit H-    Escrow Agreement

Exhibit I-    Loan Modification Agreement

Exhibit J-    Transfer Statement