# BUSINESS AND LEGAL SERVICES CONSULTANT AGREEMENT

THIS BUSINESS AND LEGAL SERVICES CONSULTANT AGREEMENT (Agreement) is made and entered into as of May 7, 2010 by and between Camelot Entertainment Group, Inc., a Delaware corporation, its assigns, successors, subsidiaries, and/or any other related entities that complete the acquisitions described in this Agreement (collectively referred to herein as the "Corporation"), with a primary business address at 8001 Irvine Center Drive, Suite 400, Irvine, CA 92618, one the one hand, and J.A. Ted Baer, an attorney licensed to practice law in the State of California and the Law Office of J. A. Ted Baer, A Professional Corporation, with a business address at 21 E. Canon Perdido Street, Suite 223, Santa Barbara, CA 93101 (the "Consultant"), on the other hand.

## RECITALS

A.      The Corporation continues to experience growth while implementing its business model.

B.      The Consultant has provided and continues to provide specific business consulting and entertainment and contractual legal services to the Corporation ("Services" as further defined below), which are valuable to and benefit the Corporation.

C.      The Consultant has provided Services to the Corporation since August 12, 2009, pursuant to the Representation Agreement attached hereto as Exhibit C.

D.      As of May 7, 2010 hereof, the Consultant has billed the Corporation for legal and business services provided to date in the amounts of $260,517.67 in cash and $221,440 in the Corporations $.0001 par value common stock ("Common Stock").

E.      As of the date hereof, the Consultant has been paid $60,000 in cash and $124,500 in the Common Stock (the number of shares subject to adjustments as described in the Representation Agreement) for Services provided to date.

F.      As of May 7, 2010, the Consultant is owed $200,517.67 in cash and $97,030 in Common Stock (the number of shares subject to adjustments as described in the Representation Agreement) for such Services.

G.      On May 7, 2010, Corporation issued the Consultant a convertible note for $200,517.67 representing all cash amounts due as of the date hereof.

H.      The Corporation has requested Consultant to continue to provide entertainment and contractual legal Services (collectively and as further described in Exhibit H, the "Services") to the Corporation on an on-going basis.

I.      The Board of Directors of the Corporation (the "Board") has determined that it is in the best interests of the Corporation and its stockholders that the Corporation retain the services of Consultant to consult with the (i) Board, (ii) officers of the Corporation, and (iii) administrative staff of the Corporation concerning issues which may occur relating to the business of the Corporation, including assisting the Corporation in implementing its business model and providing entertainment and contractual legal Services as further described in Exhibit H attached hereto.

J.      The Consultant shall provide the Services to the Corporation on an independent contractor basis pursuant to the terms and conditions of this Agreement.

NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL PROMISES, COVENANTS AND UNDERTAKINGS SPECIFIED HEREIN AND FOR OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, WITH THE INTENT TO BE OBLIGATED LEGALLY AND EQUITABLY, THE PARTIES AGREE WITH EACH OTHER AS FOLLOWS:

1.    <u>Incorporation of Recitals</u>. The Recitals are hereby incorporated into this Agreement.

2.    <u>Term of Agreement</u>. This Agreement shall be in full force and effect commencing May 7, 2010 and concluding at the close of business on December 31, 2015 (the "Term"), unless extended by mutual agreement of the parties.

3.    <u>Consultation</u>. The Consultant shall make appropriate personnel available to consult with the Board, the officers of the Corporation, and the department heads of the administrative staff of the Corporation, at reasonable times, concerning matters relating to any issue of importance regarding the business affairs of the Corporation, including, but not limited to, the specific Services detailed on Exhibit H attached hereto.

4.    <u>Management Authority; Independent Contractor Status</u>. The Consultant shall have no management authority of or for the Corporation. The Corporation's officers will operate the business affairs of the Corporation in their sole and absolute discretion. All the members of the Corporation's administrative staff shall be deemed employees of the Corporation. The Consultant shall have no control over or charge of the administrative staff and no control or authority to employ, discharge, direct, supervise or control any member of the administrative staff or other employees of the Corporation. It is the intention of the Corporation that the Consultant not undertake any activities which would make Consultant an affiliate of the Corporation, as that term is defined in the Securities Act of 1933, as amended (the "Securities Act"), or the Securities Exchange Act of 1934, as amended (the "Exchange Act") or the rules and regulations promulgated thereunder. The Corporation is interested only in the results obtained by the Consultant, who shall have the sole control of the manner and means of performing the Services under this Agreement. The Corporation shall not have the right to require the Consultant to collect accounts, investigate customer complaints, attend meetings, periodically report to the Corporation, follow prescribed itineraries, keep records of business transacted, make adjustments, conform to particular policies of the Corporation, or do anything else which would jeopardize the Consultant's status as an independent contractor performing Services for the Corporation , nor shall either the Corporation, or the Consultant, do anything that would in any way cause the Consultant to be classified as an employee of the Corporation, or as an affiliate as defined in the Securities Act or the Exchange Act without the expressed written authorization to do so by both the Consultant and the Corporation.

5.    <u>No Power of Consultant to Act as Agent</u>. The Consultant shall have no right, power or authority to be, or act, as an agent of the Corporation for any purpose whatsoever. In that regard, the Consultant shall not attempt or purport to obligate the Corporation to any obligation or agreement.

6.    <u>Base Cash and Stock Compensation</u>.

a.   Beginning May 7, 2010, the Corporation shall pay to the Consultant a base consulting fee at an annual rate of Two Hundred Forty Thousand Dollars ($240,000) (the "Base Fee"), increased by a minimum of five percent (5%) annually, or the annual adjustment in the Consumer Price Index ("CPI") as published by the US Department of Commerce, whichever is higher. The Consultant's Base Fee shall be reviewed annually by the CEO and the Board of Directors and may be increased (but not decreased) during the Term at the sole discretion of the CEO. The Base Fee shall be paid monthly as mutually determined between Consultant and the Corporation (the "Payment Due Dates"). In the event the Corporation will be unable to generate the funds necessary to satisfy the cash compensation described in this Section 6 (a) for payment of the balance due in any given month, Consultant shall receive the Corporation's $0.0001 par value Common Stock ("Shares") (as payment for the services rendered) from time to time, as directed by Consultant, until such time as the amount stated herein is paid in full.



b. All Shares issued in accordance with this Section 6, Section 7 and Section 8 shall be issued in accordance with the terms and conditions of the Corporation's 2009 Common Stock Option/Issuance Plan ("Plan"), which was registered under the Securities Act with the SEC on a Form S-8 registration statement filed November 5, 2009 and any amendments and/or subsequent Form S-8 registration filings thereto. The price per Share shall be calculated upon the average closing bid price of the Shares for the ten (10) day period immediately preceding the issuance of the Shares or $.0001 per Share, whichever is higher, and in accordance with the terms and conditions of the Plan. Consultant acknowledges and confirms that none of the services provided in connection with the registered Shares as identified in this Section 6 are for promotion and/or for financing.

c. Moreover, in the event Consultant receives Preferred Stock as consideration for the amounts due in accordance with Section 6 and/or Section 8 hereof, following the conversion into Shares of any Preferred Stock held by Consultant, if the fair market value of all such Shares received by Consultant in connection with the exercise of all Conversion Rights held thereby, does not equal the applicable amount due, then the Corporation shall immediately issue and deliver to Consultant that number of Shares to Consultant until Consultant has received the applicable amount due.

d. All Shares distributed to Consultant under any provision of this Agreement or acquired by Consultant by any means whatsoever hereunder during the Term shall be duly authorized, fully paid, fully vested and non-assessable.

e. Notwithstanding the foregoing in the event the Corporation issues Shares, or Preferred Stock, at a price per share less than any Issuance Price, under any provision of this Agreement, then the Issuance Price shall be reduced concurrently with such issue to a price equal to such lower price and the number of shares of Shares issued to the consultant shall be adjusted accordingly so long as the reduced Issuance Price is in accordance with the terms and conditions of the Plan.

f. With respect to any Shares to be transferred to Consultant under any provision of this Agreement, the Corporation shall instruct its transfer agent, Transfer Online, Inc. (the "Transfer Agent") to hold and reserve the applicable Shares for the Consultant which shall be disbursed in accordance on a schedule and pursuant to instructions from the Consultant as delineated hereunder

g. Consultant shall also receive $97,030 in the Common Stock as payment in full for all of its outstanding stock invoices with the Corporation as of May 7, 2010, such Common Stock, payable from time to time, as directed by Consultant, in consultation with the Corporation, commencing as of the date hereof and continuing until such time as the amount stated herein is paid in full.

h. In the event this Agreement is terminated due to the expiration of the Term or for any other reason other than those contained in Section 13 hereof, the terms and conditions of Section 6, and Section 9, of this Agreement shall remain in full force and effect until such time as Consultant has been paid in accordance herewith unless Consultant causes a Default as described Section 13 (c) below, in which event payments pursuant to Section 6 (a) only are subject to the terms and conditions of Section 13, and payments pursuant to Section 6 (b) and Section 9 shall remain in full force and effect until Consultant is fully paid.

7.    Bonus Stock.

a. In addition to any Shares received in accordance with Section 6 (a), 6 (b) and 6 (c) above, the Consultant shall receive five per cent (5%) of the Corporation's Class A Convertible Preferred Stock [so that Consultant owns five percent (5%) of the fully-diluted (e.g. whether through sale, merger, consolidation, reverse stock split, or any other conversion or issuance) ownership of the Corporation's Class A

Convertible Preferred Stock as adjusted on a quarterly basis]. During the Term, if the Corporation issues additional shares of the Corporation's Class A Convertible Preferred Stock, whether through sale, merger, consolidation, reverse stock split, or any other conversion or issuance that increases the amount of the Corporation's Class A Convertible Preferred Stock outstanding on a fully diluted basis, the Consultant shall receive additional Class A Convertible Preferred Stock so that the Consultant's ownership is maintained at five percent (5%) as adjusted on a quarterly basis when taking into account of the Corporation's Class A Convertible Preferred Stock.

   b. In the event Consultant becomes a member of the Corporation's Board of Directors, and as a result thereof becomes an affiliate of the Corporation as defined by the Securities Act, Consultant shall be eligible to receive an additional three per cent (3%) of the Corporation's Class B Convertible Preferred Stock or the equivalent thereof, upon becoming a member of the Board. During the Term, if the Corporation issues additional shares of any class of the Corporation's Class B Convertible Preferred Stock, whether through sale, merger, consolidation, reverse stock split, or any other conversion or issuance that increases the amount of the Corporation's Class B Convertible Preferred Stock outstanding on a fully diluted basis, the Consultant shall receive additional Class B Convertible Preferred Stock so that the Consultant's ownership is maintained at three percent (3%) as adjusted on an annual basis so long as the Consultant is a member of the Corporation's Board of Directors.

   8.  Bonus/Incentive Compensation.

   a. Upon execution of this Agreement, as a signing bonus, the Consultant shall be entitled to receive an additional Three Hundred Million (300,000,000) shares of Common Stock with a $0.0001 par value and which are fully vested, duly authorized and validly issued, freely transferable, fully paid, non-assessable, issued in compliance with all applicable state and federal laws concerning the issuance of securities.

   b. Consultant shall also be entitled to receive the following additional minimum bonuses: One Hundred Thousand Dollars ($100,000) payable in four (4) equal Twenty-Five Thousand Dollar ($25,000) annual installments beginning on the first anniversary of the commencement of this Agreement; 100,000 shares of Class "A" convertible Preferred Stock,; 500,000 shares of Class "C" convertible Preferred Stock; and 25,000 shares of Class "D" convertible Preferred Stock; provided, however, that Consultant shall only receive such bonus payments as delineated in this Section 8 (b) as Consultant may direct from time to time, in his sole, reasonable discretion, on a schedule to be determined by the Consultant and the Corporation.

   c. In the event Consultant becomes a member of the Board of Directors, Consultant shall receive an annual incentive on no less than a pari-passu basis with any incentive paid to members of the Board of Directors from an incentive pool created to compensate such executives for their on-going contribution to the management of the Corporation (the "Special Incentive Pool") but in any event not less than Fifty Thousand Dollars ($50,000.00) either in cash and/or stock as determined by the Board of Directors, provided, however, that each individual approved to participate in the Special Incentive Pool shall share on an equal pari-passu basis, so long as such individual makes a material contribution to the Corporation's business activities on an on-going basis during each such year. The Annual Incentive shall be paid no later than thirty (30) days following the close of such year, and may be subject to adjustment upon the finalization of the financial statements of the Corporation for the year in which the Annual Incentive is being paid.

   d. Notwithstanding anything to the contrary contained hereinabove, in the event Consultant becomes a member of the Board of Directors, Consultant shall also be entitled to receive no less an Incentive Bonus or any other bonus payments (including, without limitation, stock option grants, profit sharing, and the right to purchase Preferred or Common Stock shares) than granted to all other Board members specifically for services as a member of the Board, including the Special Incentive Pool.

c. The Consultant will be solely responsible for all tax returns and payments required to be filed with or made to any federal, state or local tax authority with respect to the Consultant's performance of the Services and receipt of compensation under this Agreement. Because the Consultant is an independent contractor, the Corporation will not withhold or make payments for Social Security, make disability insurance contributions, or obtain worker's compensation insurance on the Consultant's behalf. The Consultant agrees to accept exclusive liability for complying with all applicable state and federal laws governing self-employed individuals, including obligations such as payment of taxes, Social Security, disability and other contributions based on fees paid to the Consultant under this Agreement. The Consultant hereby agrees to indemnify and defend the Corporation against any and all such taxes or contributions, including penalties and interest.

9.      Warrants.

The Consultant shall be granted warrants ("Warrants") entitling the Consultant to purchase One Million Dollars ($1,000,000) of Shares priced at ten per cent (10%) above the average bid trading price of the Shares for the three month period immediately preceding each exercise date of the Warrants. The Warrants shall expire upon the termination and/or expiration of this Agreement ("Warrant Term"). The Corporation shall have at all times during the Warrant Term sufficient Shares authorized but unissued to comply with the terms and conditions of the Warrants; provided, moreover, that in the event, the Corporation does not have such sufficient Shares authorized but unissued, the Corporation shall immediately take all necessary steps to authorize and issue sufficient Shares to fulfill its obligations to Consultant under this Paragraph 9. All such certificates representing the issuance upon the exercise of the Warrants by Consultant in connection herewith, will, upon issuance and payment in full by the Consultant, be fully paid and nonassessable, free and clear of all liens, security interests, charges and other encumbrances or restrictions on sale as applicable under the Securities Act, and free and clear of all preemptive rights. The Corporation represents and warrants that these Warrants have been duly authorized, executed and delivered by the Corporation, and are a valid and binding agreement of the Corporation, and entitles the Consultant hereof, or his assignees, to purchase the Warrants upon payment to the Corporation of the Warrant purchase price applicable to such Warrants as provided for in the Plan. The Corporation also represents and warrants that the execution and delivery by it of these Warrants does not contravene or constitute a default under or violation of (i) any provision of any applicable law or regulation or (ii) the operating agreement of the Corporation, or any material agreement, judgment, injunction, order, decree or other instrument binding upon the Corporation. During the Warrant Term, the underlying Shares issuable shall have "piggyback" registration rights; provided, however, that any Shares issued to the Consultant as contemplated in this Paragraph 9 shall be issued as directed by the Consultant in his sole discretion, so that at no time shall the Consultant's holdings exceed 9.9% of the total outstanding shares of the Corporation.

10.     Expenses. During the Term, the Corporation authorizes the Consultant to incur reasonable and necessary out-of-pocket business expenses, including without limitation, automobile expenses not to exceed one thousand dollars ($1000) in any given month, business related travel and administrative expenses, in the course of performing its duties and rendering services hereunder in accordance with the Corporation's policies with respect thereto, and the Corporation shall reimburse the Consultant in cash or stock as mutually agreed upon between the Consultant and the Corporation for all such expenses, provided (i) such expenses and the purpose for which they were incurred are in accordance with the Corporation's policies, (ii) the Consultant submits to the Corporation expense reports and substantiation of the expenses in accordance with the Corporation's policies, and (iii) the Corporation approves estimated expenses in advance.

11.    Service/Effort.  During the Term the Consultant, shall devote as much time as necessary to the affairs of the Corporation as the Consultant and the Corporation mutually determine to be necessary or appropriate; and the Consultant may represent, perform services for, and be employed by, any additional persons as an attorney, or in any other capacity, in the Consultant's sole discretion, determines to be necessary or appropriate. Notwithstanding the foregoing, Consultant hereby agrees to utilize its best efforts in performing the Services.

12.    Change of Control.  In the event the Corporation experiences a "change in control" transaction, including, but not limited to, a merger, acquisition or sale of a controlling interest in the Corporation, the terms and conditions of this Agreement shall remain in effect and in full force, and such action by the Corporation shall not in any way diminish, affect or compromise the Consultant's rights, including but not limited to, all compensation as described in this Agreement, and upon such "change in control" any of Consultant's compensation as described herein which is not fully vested shall become fully-vested.

13.    Hold Harmless.

a.  The Corporation agrees to indemnify and hold harmless Consultant, its affiliates, agents, attorneys, stockholders, directors, officers, employees and controlling persons, within the meaning of Section 15 of the Securities Act, or Section 20 of the Exchange Act, from and against any and all claims, damages, actions and liabilities (including, without limitation, any and all reasonable legal expenses) incurred by the Corporation resulting from a breach by the Corporation and its principals, employees, advisors and/or consultants, of the representations and obligations made hereunder, including, without limitation, any violations of state or federal securities laws by the Corporation or any of its officers, other employees, agents, affiliates, counsel, stockholders, directors, and controlling persons in connection with the terms and conditions of this Agreement and all acts by the Corporation as a result thereof.

b.  Likewise, the Law Office of J. A. Ted Baer, A P. C. agrees to indemnify and hold harmless the Corporation and its affiliates, agents, attorneys, stockholders, directors, officers, employees and controlling persons, within the meaning of Section 15 of the Securities Act, or Section 20 of the Exchange Act, for from and against any and all claims, damages actions and liabilities (including, without limitation, any and all reasonable legal expenses) incurred by the Corporation resulting from a breach by Consultant and his principals, employees, advisors and/or consultants of the representations made hereunder, including, without limitation, any violation by the Consultant, or any of its officers, other employees, agents, affiliates, attorney, stockholders, directors, and controlling persons, of any local, state and or federal securities laws and or regulations, including those established by the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA") in connection with the terms and conditions of this Agreement.

c.  In the event Consultant commits or causes to be committed any material acts or material omissions that are due to the Consultant's gross negligence or willful misconduct (collectively "Gross Negligence"), the Corporation shall provide ten (10) business days written notice to Consultant, during which time the Consultant shall have an opportunity to cure any such Gross Negligence ("Gross Negligence Cure Period"). If such Gross Negligence is not cured during the Gross Negligence Cure Period, the Corporation shall have two (2) business days ("Termination Period") in which to terminate this Agreement. Notwithstanding the foregoing, any termination as a result of this paragraph 13, shall in no way affect any Shares, Warrants or other compensation paid or due to Consultant related to work performed for any period prior to the date of termination.

d.  The Indemnifying Party shall not be liable for any claims, damages, or liabilities caused by the sole negligence of the Indemnified Party, its subcontractors, agents, or employees.

e. The Indemnified Party shall notify promptly the Indemnifying Party of the existence of any claim, demand, or other matter to which the Indemnifying Party's indemnification obligations would apply, and shall give them a reasonable opportunity to settle or defend the same at their own expense and with counsel of their own selection, provided that the Indemnified Party shall at all times also have the right to fully participate in the defense. If the Indemnifying Party, within a reasonable time after this notice, fails to take appropriate steps to settle or defend the claim, demand, or the matter, the Indemnified Party shall, upon written notice, have the right, but not the obligation, to undertake such settlement or defense and to compromise or settle the claim, demand, or other matter on behalf, for the account, and at the risk, of the Indemnifying Party.

f. The rights and obligations of the Parties under this Article shall be binding upon and inure to the benefit of any successors, assigns and heirs of the Parties.

14. **Corporate Documents.** The Corporation will provide and deliver to Consultant, at the Corporation's expense, all documents, appraisals, projections, financial data, and other information (collectively referred to herein as the "Information"), requested by Consultant for the purpose of rendering the Services under this Agreement. All Information shall be accurate and complete, in all material respects, and the Corporation recognizes and confirms that (a) Consultant will use and rely on the Information without having independently verified the same, and (b) Consultant does not assume responsibility for the accuracy or completeness of the Information.

15. **Corporate Disclosure.** The Corporation shall use its best efforts to disclose to Consultant all material events and developments that have occurred prior to the date of this Agreement relating to the Corporation's financial condition, operations or prospects. During the Term, the Corporation will promptly notify Consultant of any material event or development relating to the financial condition, business operations or business prospects of the Corporation and promptly deliver to Consultant copies of all material filings made by the Corporation with any regulatory agency and copies of all press releases issued by the Corporation and make available same for inspection by Consultant, during regular business hours and upon 24 hours notice by Consultant.

16. **Confidentiality.** The Consultant has and will have access to and participate in the development of or be acquainted with confidential or proprietary information and trade secrets related to the business of the Corporation, its parent, subsidiaries and affiliates (the "Corporations"), including but not limited to (i) business plans, operating plans, marketing plans, bid strategies, bid proposals, financial reports, operating data, budgets, wage and salary rates, pricing strategies and information, terms of agreements with suppliers or customers and others, customer lists, formulas, patents, devices, software programs, reports, correspondence, tapes, discs, tangible property and specifications owned by or used in the Corporation' businesses, operating strengths and weaknesses of the Corporation' officers, directors, employees, agents, suppliers and customers, and/or (ii) information pertaining to future developments such as, but not limited to, research and development, future marketing, distribution, delivery or merchandising plans or ideas, and potential new distribution or business locations, and (iii) other tangible and intangible property, which is used in the business and operations of the Corporation, but not made publicly available (the "Confidential Information"). Consultant agrees to keep confidential all Confidential Information, including, but not limited to, all material, non-public Confidential Information provided to it by the Corporation, except as required by law or as contemplated by the terms of this Agreement. It is further agreed that from time to time that the Corporation may designate certain disclosed information as confidential for purposes of this Agreement. Notwithstanding anything to the contrary herein, Consultant may disclose non-public Information to its agents and advisors whenever Consultant determines that such disclosure is necessary or advisable to provide the Services. The Consultant hereby acknowledges and affirms that it has been notified by the Corporation that this Agreement and all other agreements between the parties may be included in various filings that the Corporation is required make, or elects to make, with the SEC and various state agencies. The Consultant shall

not, directly or indirectly, disclose, use or make known for its or another's benefit any Confidential Information of the Corporation or use such Confidential Information in any way except in the best interests of the Corporation in the performance of the Law Corporation's duties under this Agreement. The obligations of the Consultant under this Section 16 shall survive the termination of the Consultant's engagement and the expiration or termination of this Agreement.

17.     **Work Product.** The Consultant hereby irrevocably assigns to Corporation, and Corporation shall have, exclusive ownership rights, including, without limitation, all patent, copyright, trademark and trade secret rights, with respect to any work produced by Consultant in the course of rendering Services to Corporation including, but not limited to, the development, modification or enhancement of systems, programs, instructions, concepts and documentation developed for or relating to Corporation and all documents, data and other information of any kind including information incorporating, based upon or derived from the foregoing, including reports and notes prepared by the Consultant. Such work product will be the property of Corporation and may not be used by the Consultant for any other purpose than the benefit of Corporation. Any and all such property and material containing such property shall be delivered promptly to Corporation on request of the Corporation and in any event at the termination of the Consultant's work for Corporation and no copies thereof shall be retained by the Consultant unless the prior written consent of the Corporation. To that extent, immediately upon termination of the Consultant's engagement with the Corporation, the Consultant shall deliver to the Corporation all copies of data, information and knowledge of Corporation, including, without limitation, all Confidential Information, documents, correspondence, notebooks, reports, computer programs, names of full-time and part-time employees and consultants, and all other materials and copies thereof (including computer discs and other electronic media) relating in any way to the business of the Corporation in any way obtained by the Consultant during the period of its engagement with the Corporation. Notwithstanding the provisions of this Section, any agreements with respect to which the Consultant is a party (including without limitation this Agreement) and any documents the Consultant is required to retain in accordance with applicable law may be retained by the Consultant, provided, however, that the Consultant shall provide the Corporation with copies of any documents the Consultant is required to retain in accordance with applicable law. Immediately upon termination of the Consultant's engagement with the Corporation, the Consultant shall deliver to the Corporation all tangible property belonging, leased or licensed to Corporation in the possession of the Consultant including, without limitation, telephones, facsimile machines, computers, leased automobiles and credit cards. A certificate evidencing compliance with this provision shall, if requested by Corporation, accompany such materials. Further, the Consultant will execute and deliver all documents required by Corporation to document or perfect Corporation's proprietary rights in said work. Such work shall be a work made for hire and the Consultant shall have no proprietary interest herein. All deliverables shall bear Corporation's copyright and trade secret notices. The obligations of the Consultant under this Section 17 shall survive the termination of the Consultant's engagement and the expiration or termination of this Agreement.

18.     **Advertisements; No Faxes; No emails.** In the event that the Consultant finds itself in a position to make a newsworthy announcement, including, but not limited to, a new product, sales results, existing product information or expansion in connection with the Corporation, Consultant will have the right to place advertisements in various media outlets, including, but not limited to, print publications, the internet, direct mail, radio, television, satellite or cable, describing its Services to the Corporation hereunder; provided, however, that Consultant will submit copies of such advertisements to the Corporation so that the Corporation may consent to the form and content of such advertisements, approval of which shall not reasonably be withheld. Notwithstanding the foregoing, Consultant shall not knowingly directly authorize, direct or place any announcements or other material of any type to be faxed and or emailed, including, but not limited to, promotional material of any nature, type or form, relating to the Corporation, nor shall the Consultant contract with any third party to fax or email such notices, without the expressed written consent of the Corporation. In the event Consultant fails to honor, and is therefore in default of this Section 18 ("Default"), the Corporation

shall provide ten (10) business days written notice to Consultant, during which time the Consultant shall have an opportunity to cure any Default ("Cure Period"). If such Default is not cured during the Cure Period, the Corporation shall have two (2) business days ("Termination Period") in which to terminate this Agreement. Notwithstanding the foregoing, any termination as a result of this Section 18, shall in no way affect any Shares, Warrants or other compensation paid or due to Consultant related to work performed for any period prior to the date of termination.

19.     Consultant Representation. Consultant represents and warrants to Corporation that: (a) Consultant is not a broker dealer; (b) to the best of his knowledge, Consultant and its principals, employees, advisors and/or consultants are not and will not violate any federal and/or state securities laws and/or regulations in performing the Services contemplated by this Agreement; (c) Consultant and its principals, employees, advisors and/or consultants are not receiving compensation based upon the performance, including, but not limited to, price and volume, of any security connected with this Agreement, including, but not limited to, the Shares; and (d) In addition to cash payments, Consultant is receiving as consideration hereunder a specific number of Shares for the Services performed.

20.     Failure to act by One Person. Any direction, consultation given, or service performed by any persons acting on behalf of the Consultant pursuant to the provisions of this Agreement shall constitute the performance of the Service by the Consultant.

21.     Remedies. As a result of the uniqueness of the Services to be performed by the Consultant for the Corporation, and because the Consultant's reputation in the community may be affected by the financial success or failure of the Corporation. in addition to the other rights and remedies that the Consultant may have for a breach of this Agreement, the Consultant shall have the right to enforce this Agreement, in all of its provisions, by specific performance or other relief in a court or equity. Notwithstanding the foregoing, if the Consultant commits a breach, or threatens to commit a breach, of any of the provisions of Section 16, 17 or 18 of this Agreement (subject to Section 13), the Corporation shall have the following rights and remedies:

a.     the right and remedy to seek to have the provisions of Sections 16, 17 and/or 18 specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the Corporation and that money damages will not provide an adequate remedy to the Corporation. The Consultant further agrees that no bond or other security shall be required in obtaining such equitable relief and hereby consents to the seeking of an injunction or to the seeking of an order of specific performance; and

b.     the right and remedy to seek to require the Consultant to account for and pay over to the Corporation all compensation, profits, monies, accruals, increments, or other benefits (collectively referred to as the "Benefits") derived or received by the Consultant as the result of any transactions constituting a proven breach in a court of final adjudication of any of the provisions of Sections 16, 17, and/or 18 of the Agreement and the Consultant hereby agrees to account for and pay over the benefits to the Corporation.

While the Consultant expressly acknowledges the scope of the restrictive covenants are reasonable and necessary to protect the Corporation's legitimate business interests, if any covenants contained in Sections 16, 17, and/or 18 of this Agreement, or any part thereof, is held to be unenforceable because of the duration of such covenant or the area covered thereby, the parties agree that the court making such determination shall reduce the duration and/or area of such covenant and, in its reduced form, said covenant shall then be enforceable.

22.    Consultant's Representatives.  In its performance of the Services, the Consultant shall have the right to appoint or otherwise designate suitable and desirable employees, agents and representatives (the "Consultant's Representatives").  The Consultant shall be solely responsible for the Consultant's Representatives, including but not limited to, their acts, omissions, and liabilities.  Consultant agrees that the Consultant's Representatives shall not have any claim against the Corporation for salaries, commissions, items of cost, or other form of compensation or reimbursement.  The Consultant represents, warrants, and covenants that the Consultant's Representatives shall be subordinate to the Consultant and subject to each and all of the terms, provisions and conditions applying to the Consultant specified in this Agreement.

23.    Attorneys' Fees.  In the event any party to this Agreement shall commence legal proceedings against another party to enforce the terms hereof, or to declare rights hereunder, as the result of a breach of any covenant or condition of this Agreement, the prevailing party in any such proceeding shall be entitled to recover from the losing party its costs of suit, including reasonable attorneys' fees, as may be fixed by the court.

24.    Governmental Rules and Regulations.  The provisions of this Agreement are subject to any and all present and future orders, rules and regulations of any duly constituted authority having jurisdiction of the relationship contemplated by the provisions of this Agreement.

25.    Notices.  Any notice, request, instruction, or other document required by the terms of this Agreement, or deemed by any of the parties hereto to be desirable, to be given to any other party hereto shall be in writing and shall be given by personal delivery, overnight delivery, mailed by registered or certified mail, postage prepaid, with return receipt requested, or sent by facsimile transmission to the addresses of the Parties as follows:

If to the Corporation:

Robert P. Atwell
Camelot Entertainment Group, Inc.
8001 Irvine Center Drive, Suite 400
Irvine, California 92618
bob@camelotfilms.com
Tel: 949-754-3030
Fax: 949-643-5504

If to the Consultant:
J. A. Ted Baer, Esq.
Law Office of J. A. Ted Baer
21 E. Canon Perdido Street
Suite 225
Santa Barbara, CA 93101
jtaedbaer@aol.com
Tel: 805-963-7177
Fax: 805-730-2874

The persons and addresses set forth above may be changed from time to time by a notice sent to the address noted above.  If notice is given by personal delivery or overnight delivery in accordance with the provisions of this Section 25, such notice shall be conclusively deemed given at the time of such delivery, provided a receipt is obtained from the recipient.  If notice is given by mail in accordance with the provisions of this Section, such notice shall be conclusively deemed given upon receipt and delivery or refusal.  If notice is given by facsimile transmission in accordance with the provisions of this Section, such notice shall be conclusively deemed given at the time of delivery if during business hours and if not during business hours, at the next business day after delivery, provided a confirmation is obtained by the sender.

26.  Termination.

a.  Termination Events.  The Consultant's engagement by the Corporation pursuant to this Agreement shall terminate on the earliest of any of the following (each, a "Termination Event"):

    i.  the expiration of the Term;

    ii.  the date of the Consultant's death;

    iii.  the date set forth in the written notice from the Corporation to the Consultant that the Consultant's engagement is being terminated because the Consultant has been determined to be disabled by the Board of Directors based upon the advice of a board-certified physician reasonably acceptable to the Corporation and the Consultant or his legal representative, including, but not limited to, a determination that the Consultant is unable, because of physical or mental illness or incapacity or otherwise, to fulfill his duties under this Agreement for more than ninety (90) days in the aggregate in any twelve (12) month period (a termination due to "Disability");

    iv.  the date set forth in the written notice from the Corporation to the Consultant informing the Consultant that it is being terminated as a result of the occurrence of the following (a termination for "Cause"):the Consultant commits a material breach (which may include, without limitation, (i) a violation of a law material to the conduct of the Corporation's business, (ii) a breach of fiduciary duty to the Corporation, (iii) any act of dishonesty or fraud involving the Corporation, (iv) failure to perform Consultant's duties in accordance herewith of this Agreement and the Consultant fails to correct such breach (assuming it is correctable) within thirty (30) business days following written notice (specifying the material breach) from the Corporation.; or

    v.  the date set forth in the written notice from the Corporation to the Consultant informing the Consultant that the Board of Directors has determined in its sole discretion to terminate the engagement of the Consultant other than for any of the reasons set forth in Sections 26 a i, a ii, a iii, or a iv above (a "without Cause" termination by the Corporation);

    vi.  the date set forth in the written notice from the Consultant to the Corporation informing the Corporation that the Consultant has elected to terminate its engagement with the Corporation for "Good Reason."  As used herein, "Good Reason" shall mean that one or more of the following events has occurred: (a) the Consultant suffers a material adverse reduction in his authority, duties, or responsibilities, (b) the Consultant's Base Fee is decreased, (c) the Corporation fails to reimburse the Consultant for business expenses in accordance with the Corporation's policies, and (d) any material breach of this Agreement by the Corporation. Good Reason shall not exist unless after written demand for specific performance is delivered by the Consultant specifically identifying the manner in which the Consultant believes the Corporation has breached this Agreement causing Good Reason to occur, the Corporation fails to correct such alleged breach within a period of thirty (30) business days after such written demand is received by the Corporation.  The Consultant agrees to provide the Corporation with written notice of an alleged breach causing Good Reason at least ninety (90) days prior to the last day of the Term as set forth in Section 1 of the Agreement;

    vii.  the date set forth in the written notice from the Consultant to the Corporation informing the Corporation that the Consultant has elected to voluntarily terminate its engagement with the Corporation without Good Reason (a termination without Good Reason by the Consultant); provided, however, that the Consultant agrees to provide the Corporation with such written notice at least thirty (30) days prior to the last day of the Consultant's engagement.

      b.      Time of Termination. The Consultant's engagement with the Corporation shall terminate immediately upon the Consultant's death, on the date set forth in a written notice of such termination upon the occurrence of any event and the expiration of any cure period, if applicable, specified hereunder, or upon expiration of the Term (each such termination date, the "Effective Termination Date").

      c.      Effect of Termination of Engagement. Upon termination of the Consultant's engagement for any reason other than for Cause or Consultant terminating this Agreement:

      i.      the Consultant shall return all property of the Corporation as provided in Section 17 of this Agreement;

      ii.      the Consultant's Base Fee shall continue to accrue, and the Consultant shall be paid all Base Fee through the date of the Term of this Agreement;

      iii.      the Consultant shall no longer be eligible for further reimbursement of business expenses, other than reimbursement based upon timely submission of any claims for reimbursement of business expenses incurred prior to termination of the Consultant's engagement in accordance with Section 10, and within the time period required under the Corporation's policies generally; and

      iv.      the Consultant shall be entitled to receive the Annual Incentive (to the extent it has not already been paid) for the most recent calendar year completed prior to termination of the Consultant's engagement.

      d.      Termination Payment and Additional Vesting under Certain Circumstances.

      In the event that the Consultant's engagement with the Corporation is terminated by reason of a termination by the Corporation without Cause hereunder, or by reason of a termination by the Consultant for Good Reason hereunder, in addition to the payments and benefits set forth above, the Corporation shall continue to pay to the Consultant the Base Fee for the period set forth below immediately following the Consultant's termination of engagement:

| Reason for Termination | Corresponding Period of Severance Payments After Termination |
|---|---|
| Termination by the Corporation without Cause; | End of Term |
| Consultant for Good Reason | End of Term |

      Such continuation of Base Fee payments shall be made by the Corporation subject to compliance by the Consultant with the other terms and conditions of this Agreement (including without limitation, Sections 16, 17 and 18 hereof). In the event the Consultant is entitled to receive continuation payments pursuant to this Section, (i) the Consultant shall also be entitled to receive a pro-rata portion of the Annual Incentive for the calendar year during which the Consultant's engagement terminates; such pro-rata portion of the Annual Incentive shall be based on the targets established for such year multiplied by the number of days from January 1 of such year through the last day of Consultant's engagement over 365; payment shall be made at the time specified herein; and (ii) the Consultant shall also be entitled to have any Warrants, which would otherwise vest (by the passage of time) during the twelve (12) month period immediately following its termination of engagement, immediately vest, irrespective of any performance goals that have been established or other requirements.

27.   Entire Agreement. This Agreement supersedes any and all other agreements, either oral or in writing, between the parties regarding the subject matter of this Agreement and specifies all the covenants and agreements between the parties with respect to that subject matter, and each party acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by any party, or anyone acting on behalf of any party, which are not specified in this Agreement; and any other agreement, statement or promise concerning the subject matter specified in this Agreement shall be of no force or effect in a subsequent modification in writing signed by the party to be charged. Notwithstanding the foregoing, the rights of the Consultant and obligations of the Corporation from prior work performed under the Representation Agreement shall continue in full force and effect.

28.   Severability. In the event any provision of this Agreement, for any reason, is determined to be invalid, such determination shall not affect the validity of any remaining portion of this Agreement, which remaining portion shall remain in complete force and effect as if this Agreement had been executed without the invalid portion of this Agreement. It is hereby declared the intention of the parties that the parties would have executed the remaining portion of this Agreement without including any such part, parts or portion which, for any reason, hereafter my be determined invalid.

29.   Captions and Interpretation. Captions of the paragraphs of this Agreement are for convenience and reference only, and the words contained in those captions shall in no way be held to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Agreement. The language in all parts to this Agreement, in all cases, shall be construed in accordance with the fair meaning of that language as if that language was prepared by all parties and not strictly for or against any party.

30.   Further Assurances. Each party shall take any and all action necessary, appropriate or advisable to execute and discharge such party's responsibilities and obligations created by the provisions of this Agreement and to further effectuate, perform and carry out the intents and purposes of this Agreement and the relationship contemplated by the provision of this Agreement.

31.   Number and Gender. Whenever the singular number is used in this Agreement, and when required by the context, the same shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders, and vice versa; and the word "person" shall include corporation, firm, trust, association, governmental authority, municipality, association, sole proprietorship, joint venture, association, organization, estate, joint stock company, partnership, or other form of entity.

32.   Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

33   Successors and Assigns. This Agreement and each of the provisions of this Agreement shall obligate and inure to the benefit the heirs, executors, administrators, successors and assigns of each of the parties; provided, however, nothing specified in this paragraph shall be a consent to the assignment or delegation by any party of such party's respective rights and obligations created by the provisions of this Agreement.

34.   Reservation of Rights. The failure of any party at any time hereafter to require strict performance by the other party of any of the warranties, representations, covenants, terms, conditions and provisions specified in this Agreement shall not waive, affect or diminish any right of such failing party to demand strict compliance and performance therewith and with respect to any other provisions, warranties, terms and conditions specified in this Agreement. None of the representations, warranties, covenants, conditions, provisions and terms specified in this Agreement shall be deemed to have been waived by any act or knowledge of either party or such party's agents, officers or employees, and any such waiver shall be made only by an instrument in writing, signed by the waiving party and directed to each non-waiving party specifying such waiver

35.     Concurrent Remedies. No right or remedy specified in this Agreement conferred on or reserved to the parties is exclusive of any other right or remedy specified in this Agreement or by law or equity provided or permitted: but each such right and remedy shall be cumulative of, and in addition to, every other right and remedy specified in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise, and may be enforced concurrently therewith or from time to time. The termination of this Agreement for any reason whatsoever shall not prejudice any right or remedy which either party may have, either at law, in equity, or pursuant to the provisions of this Agreement.

36.     Choice of Law. This Agreement and the rights of the parties hereunder shall be governed by and construed in accordance with the laws of the State of California including all matters of construction, validity, performance, and enforcement and without giving effect to the principles of conflict of laws.

37.     Exclusive Jurisdiction and Venue. The parties agree that the Courts of the County of Orange, State of California shall have sole and exclusive jurisdiction and venue for the resolution of all disputes arising under the terms of this Agreement and the transactions contemplated herein.

38.     Assignability. Except as otherwise provided herein, neither party shall sell, assign, transfer, covey or encumber this Agreement or any right or interest in this Agreement, or suffer or permit any such sale, assignment, transfer or encumbrance to occur by operation of law without the prior written consent of the other party. In the event of any sale, assignment, transfer or encumbrance consented to by such other party, the transferee or such transferee's legal representative shall agree with such other party in writing to assume personally, perform and be obligated by the covenants, obligations, warranties, representations, terms, conditions and provisions specified in this Agreement, including, without limitation, all the executory obligations. Notwithstanding the foregoing, the Corporation expressly agrees that, so long as the Consultant continues to render Services hereunder to the Corporation, the Consultant may without notice or consent of the Corporation assign his rights to compensation under this Agreement as the Consultant may deem necessary or appropriate, including assignments as collateral security to Consultant's lenders, affiliates, trust and others.

39.     Continuing Provisions. Notwithstanding anything to the contrary contained herein, all provisions concerning confidentiality, indemnification, contribution, and the Corporation's remaining payment obligations, if any, contained herein shall survive any expiration or termination of this Agreement.

40.     Force Majeure.

a.      If any party is rendered unable, completely or partially, by the occurrence of any event of "force majeure" (as defined below) to perform such party's obligations under this Agreement, such party shall give to the other party prompt written notice of the event of "force majeure" with reasonably complete particulars concerning such event thereupon, the obligations of the party giving such notice, so far as those obligations are affected by the event of "force majeure," shall be suspended during, but no longer than, the continuance of the event of "force majeure." The party affected by such event of "force majeure" shall use all reasonable diligence to resolve, eliminate and terminate the event of "force majeure" as quickly as practicable.

b.      The requirement that an event of "force majeure" shall be remedied with all reasonable dispatch as herein above specified, shall not require the settlement of strikes, lockouts or other labor difficulties by the party involved, contrary to such party's wishes, and the resolution of any and all such difficulties shall be handled entirely within the discretion of the party concerned.

c.      The term "force majeure" as used herein shall be defined to mean any act of God, strike, civil disturbance, lockout or other industrial disturbance, act of the public enemy, war, blockage, public riot, earthquake, tornado, hurricane, lightening, fire, public demonstration, storm, flood, explosion, governmental action, government delay, restraint or inaction, unavailability of equipment, and any other cause or event, whether of the kind enumerated specifically herein, or otherwise, which is not reasonably within the control of the party claiming such suspension

41.    Consent to Agreement.  By executing this Agreement, each party, for itself, represents such party has read or caused to be read this Agreement in all particulars, and consents to the rights, conditions, duties and responsibilities imposed upon such party as specified in this Agreement.

42.    Conflicting Documents.  In the event the Consultant is party to another agreement or subject to a policy which conflicts with the terms of this Agreement, the terms of this Agreement shall control. Notwithstanding the foregoing, the rights of the Consultant and obligations of the Corporation from prior work performed under the Representation Agreement prior to and up to the date of this Agreement shall continue in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement, as of the date first written hereinabove.

CORPORATION:                                  CONSULTANT:

Camelot Entertainment Group, Inc.             J. A. Ted Baer
a Delaware corporation                        Law Offices of J.A. Ted Baer

By: _____                   By: _____
Robert P. Atwell                              J.A. Ted Baer
Chairman

By:_____                    By: _____
George Jackson                                J.A. Ted Baer
CFO                                           an individual

I have read the foregoing Agreement and agree to render all services, and observe all requirements to enable the Law Corporation to comply with its obligations under said Agreement.

_____                                                    J.A.
Ted Baer

Exhibit C

Representation Agreement



LAW OFFICE OF
J.A. TED BAER
A PROFESSIONAL CORPORATION
21 E. CANON PERDIDO STREET
SUITE 223
SANTA BARBARA, CA 93101
TEL: 805-963-7177
Cell: 805-441-4135
FAX: 801-730-2874
EMAIL: jatedbaer@aol.com

As of August 12, 2006

Mr. Robert P. Atwell
Chairman and Chief Executive Officer
Camelot Entertainment Group, Inc. (CEG)
8001 Irvine Center Drive
Suite 400
Irvine, CA 92618

Re:   Representation Agreement

Dear Bob:

We, J. A. Ted Baer, a P.C. ("we" "us"), are pleased to have
the opportunity to represent you in connection with your
company's legal and business affairs. This letter confirms
the terms and conditions of our engagement.

1.    (a)  We will render customary legal and business affairs
services in connection with all legal matters pertaining to
CEG's employment of certain executives, and the proposed
acquisition of three companies: Cineworks Digital Studios, Inc.
and an affiliate, Cineworks LA, Inc., Revelation Films, Ltd.,
and Barrholtz Entertainment, Inc. or similar companies, and
other business and legal matters, as you request, in connection
with the production and distribution of projects in all media
throughout the world (collectively the "Projects"). Thereafter,
per your request and our agreement on a case-by-case basis,
subject to our availability and evaluation of subsequent legal
matters, we will render customary transactional legal services
of other entertainment industry transactions pertaining to you
consistent with the terms and conditions herein.



(b)  Be advised, however, that our services do not include extraordinary matters such as litigation, trademark, arbitration, corporate, tax and immigration matters, estate planning, non-entertainment legal work such as real estate matters, matters on which you are instructed to engage additional counsel, matters which pertain to your personal life, criminal matters, or businesses outside of your involvement in the entertainment industries (collectively, "Excluded Matters").  If, at your request, we agree to represent you in connection with any of the Excluded Matters, then, in addition to any related costs, we shall be paid a reasonable legal fee for such services which shall be mutually determined by you and us depending on our assessment of the particular matter.

2.   (a)  Our charges for the services we render will be in accordance with our usual and customary hourly fee and contingency rates.  Our hourly rates will be based upon our standard charges for professional, and other direct hours devoted to providing services to you as well as those factors set forth in Rule 2-107 of the Rules of Professional Conduct of the California State Bar Association.  The current rate for the legal services of J. A. Ted Baer is $450 per hour; however, for the Projects, in lieu of payment of this hourly rate, we have agreed to accept, and you have agreed to pay our fees as follows: $250.00/per hour and $200.00/per hour in CEG Registered Common Stock, such value for the Common Stock shall be calculated at the thirty (30) day average bid price for the period of thirty (30) days prior to issuance ("Issuance Price").  In the event CEG issues common stock, preferred stock or any other debt or equity instrument convertible into equity of CEG, at a price per share less than any Issuance Price, then the Issuance Price shall be reduced concurrently with such issue to a price equal to such lower price and the number of shares of common stock issued to J.A. Ted Baer shall be adjusted accordingly.

(b)  Any fees incurred with respect to our services will be billed to you on a monthly basis, together with costs incurred on your behalf as delineated in Paragraph 3 below, by means of an itemized summary statement, however, all applicable stock shall be issued to JATB based on the actual hours expended on services hereunder and will be granted no less than on a monthly basis based on the last day of each month on the hours incurred. Our hourly fees are billed on one-tenth of an hour increments and are periodically adjusted; our statements will reflect the fees in effect when the services are rendered.



2

(c)   As an initial advance against our fees (and any incidental costs and expenses incurred on your behalf as delineated in Paragraph 3 below), for the Projects, you shall pay us a retainer of Fifteen Thousand Dollars ($15000.00), payable Ten Thousand Dollars ($10,000) upon the execution of this Agreement, and Five Thousand Dollars ($5000.00) on or before August 31, 2005. Notwithstanding anything to the contrary, it is understood that we may deposit said funds in our general accounts, that the hourly fees payable on an hourly rate basis hereunder shall be deducted from the retainer, that we may request additional retainer fees (which shall include the stock as delineated above) in the event that the initial retainer is fully utilized hereunder, and that upon conclusion of our services hereunder, any balance remaining after deducting the applicable fees actually earned hereunder shall be returned to you. You acknowledge that we are not obligated to provide any services to you or on your behalf unless you have a retainer credit balance.

(d)   You acknowledge that the fee delineated in this Paragraph 2 is not set by law but rather is negotiable between us. You further acknowledge that we have discussed and agreed upon the fee arrangement in this agreement. You also acknowledge that we have made no promises about the total amount of fees to be incurred by you.

3.     If we make any disbursement or incur any costs on your behalf (e.g., photocopy, long distance telephone, fax, messenger), you agree to advance to us or reimburse us on a monthly basis all such disbursements and costs. As delineated in Paragraph 2(b) above, any retainer fee will also serve as advances to us against such disbursements or costs, and any such deductions therefrom will be itemized on your monthly summary statement. We will not incur any total expense over $100 without prior approval.

4.     The term of this Agreement begins on the date stated above and will thereafter continue indefinitely unless (i) you send us a letter terminating our services or (ii) we withdraw from our representation of you as further described in Paragraph 7 below.

5.     We agree to make a good faith effort with respect to our representation of you. However, you acknowledge that nothing in this agreement and nothing in our statements to you, express or implied, will be construed as a promise or guarantee concerning the outcome or progress of any of your matters; we make no such promises or guarantees.

3

6.   You agree to be truthful with us, to cooperate, to keep us fully informed of developments, to abide by this agreement, and to keep us advised of your address, and telephone number.

7.   We may withdraw from our representation of you with your consent or for good cause or as otherwise permitted by the California Code of Professional Conduct of the State Bar of California.   Good cause includes your breach of this agreement, your refusal to cooperate with us or follow our advice on a material matter, or any fact or circumstance that would render our continuing representation unlawful or unethical.

8.   (a)  When our services conclude all unpaid amounts due and payable to us will immediately become due and payable, including, without limitation, the applicable amount of stock. Notwithstanding the foregoing, after our services conclude on a particular matter, we will, upon your request and at your cost, deliver your file to you, along with any of your funds or property in our possession.   We shall have no obligation to retain your files and may dispose of same beyond one (1) year after services conclude on a particular matter if there is no signed agreement in connection with said matter, or if there is a fully executed agreement negotiated with respect to a particular matter, then two (2) years after the execution of said agreement.

      (b)  If we are discharged before conclusion of our services, whether with your consent, for good cause, or otherwise, then the terms of this agreement shall nevertheless continue to apply to our services rendered and costs incurred at any time thereafter in connection with the resultant transition to you or your successor legal counsel.

9.   You acknowledge and agree that it is your responsibility, and not our responsibility, to note and calendar any and all option dates, trigger dates, termination dates, and/or audit dates with respect to any and all agreements entered into by you (whether or not said agreements were reviewed and negotiated by us) including, but not limited to, option extension or termination dates, option purchase dates, dates relating to your rights of audit, and audit expiration dates. Accordingly, we will not remind you to send letters exercising or terminating any options pursuant to any agreements entered into by you.



4

10.   In the event of dispute between us regarding fees, costs or any other aspect of our attorney-client relationship, the dispute shall be arbitrated privately and confidentially in Los Angeles, California on an expedited basis.   Such arbitration shall, in all other respects, be conducted in accordance with the rules of the American Arbitration Association.   The prevailing party in any arbitration or other adjudication to this agreement shall be entitled to recover from the losing party its attorneys' fees and costs.

11.   By signing below, you agree that your name, logo and a general description of your matters may be used by us in our business development efforts.

12.   By signing below, you also acknowledge that you have been requested by us to seek independent legal and business advice with respect to this agreement and our representation of you as specified herein, and that you have either sought such advice or deliberately refrained from doing so.

We look forward to representing you in connection with your transactional legal matters in the entertainment industry as provided for herein.   If the arrangements described above are acceptable, then please sign below.

Kind regards.


                                    Very truly yours,
                                    J.A. TED BAER
                                    A Professional Corporation

                                    BY _____
                                       J.A. TED BAER



AGREED, ACCEPTED AND APPROVED:


CAMELOT ENTERTAINMENT GROUP, INC.

BY: _____



                                                        5

Exhibit H

Specific Services

(including, but not limited to the following):

A.     Provide business, management, consulting and legal services and business development and production legal services and support to the Corporation.

B.     Provide a general business and financial analysis of the Corporation's proposed business plan with respect to the business of Corporation.

C.     Assist in the formulation and evaluation of various structural and financial alternatives.

D.     Provide the Corporation with business advisory services.

E.     Review and analyze all aspects of the Corporation's structure and its goals and make recommendations on feasibility and achievement of desired goals.

F.     Provide Entertainment, Contractual and General Business Legal Services to the Corporation.

G.     Assist Corporation in the preparation of all legal documents, business plans, offering statements, private placement memorandums, registrations and all other documents as requested by Corporation.

